**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| SEED CX LTD.<br><br>        Plaintiff,<br><br>v.<br><br>RUSSELL ANDERSSON AND HEALTH CARE ANALYTICS, LLC.<br><br>        Defendants. | Case No. |

## <u>VERIFIED COMPLAINT</u>

Plaintiff Seed CX Ltd. ("Seed CX") brings this action against Russell Andersson and Health Care Analytics, LLC (collectively, "Andersson"), and in support hereof states as follows:

### NATURE OF THE ACTION

1.      Seed CX brings this action to stop the misappropriation of its trade secrets and the ongoing breach of the parties' original 2015 Consulting Agreement and the Amended 2018 Consulting Agreement.

2.      Seed CX is a Chicago based startup that, together with its wholly owned subsidiaries, is building an exchange on which people can trade digital assets, such as Bitcoin and other crypto-based assets.

3.      Andersson worked for Seed CX as a consultant from 2015 to 2018.

4.      Through Andersson's work for Seed CX, Andersson had access to Seed CX's confidential and proprietary information, including financial, sales, strategy and modeling data, market research, competitor landscape, and customer and investor lists.

5.      As a part of Andersson's contracts, Andersson had to keep Seed CX's confidential information confidential, and under the 2015 contract, Andersson was prohibited from competing with Seed CX for 12 months from Andersson's termination of the contract in April 2018.

6.      In August 2018, after three years of working with Seed CX, Andersson breached the contracts and started a company that is directly competitive to Seed CX called Chicago Digital Asset Exchange.

7.      In addition to breaching the agreements, Andersson misappropriated Seed CX's trade secrets and confidential information. Just days after the website URL ChicagoDigitalAssetExchange.com was registered, Andersson used his access to Seed CX's secure databases to download financial and modeling data.

8.      Andersson also solicited information from a junior employee at Seed CX related to the competitive landscape among digital asset exchanges. And on the same day he solicited another employee at Seed CX for modeling data.

9.      Andersson then contacted Seed CX's flagship funder and future customer (an investor whose interest in the digital assets space was only known to Andersson because of his status at, and engagement with, Seed CX) and asked for a meeting to pitch the Chicago Digital Asset Exchange.

10.     The presentation Andersson prepared included Seed CX's confidential and proprietary information, including trade secrets.

11.     As explained in more detail below, Andersson violated the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1830, *et seq.*, the Illinois Trade Secrets Act, 765 ILCS 1065/1, *et seq.*, and breached two valid consulting agreements between the parties.

12.     Seed CX now seeks to enjoin Andersson from using its confidential information and trade secrets, obtain specific performance of the contracts' non-compete and confidentiality provisions, and to recover damages, to the extent those can be calculated.

## THE PARTIES

13.     Plaintiff Seed CX Ltd is a Delaware corporation with its principal place of business in Chicago, Illinois.  Seed CX is a startup that, together with its wholly owned subsidiaries, (collectively, "Seed") is building a trading platform on which people can trade and exchange digital assets, such as Bitcoin and other crypto-based assets.

14.     Defendant Russell Andersson is, on information and belief, a resident of the state of California.

15.     Defendant Health Care Analytics, LLC is, on information and belief, a limited liability corporation incorporated in Delaware, with its principal place of business in California.[1]

## JURISDICTION AND VENUE

16.     This Court has personal jurisdiction over Andersson under 735 Ill. Comp. Stat. 5/2-209 and Fed. R. Civ. P. 4(K)(1)(A) because Andersson purposefully availed himself of the benefits of conducting business in Illinois, by among other things:

    a.      Working in his capacity as a consultant for Seed, whose headquarters is in Chicago, IL for three years, from 2015 to 2018.

    b.      Traveling to Illinois specifically to work at Seed's office in Chicago, Illinois, including, six days in the last few months; July 11,12, 13 and August 6, 7, and 8, 2018.

---

[1] Because Mr. Andersson is the only individual at Health Care Analytics who had any involvement or interaction with Seed and was the signatory on the party's contracts, "Andersson" will refer to both Health Care Analytics, LLC and Russell Andersson for the remainder of the Complaint (unless indicated otherwise).

     c.     Agreeing as part of the 2018 Consulting Agreement to be onsite at Seed's office in Chicago at least 3 days a month.

     d.     Intentionally breaching the 2015 and 2018 Consulting Agreements with Seed by misusing Seed's confidential information and violating the non-compete restrictions.

     e.     Meeting with Seed's investors and potential customer in Seed's Chicago office, including on August 6, 2018.

     f.     Performing business functions, including recruiting out of Seed's Chicago office.

     g.     Intentionally taking and using Seed's confidential information, including downloading information off of Seed's database.

     h.     Purposefully soliciting a Seed employee, who was located in Seed's offices in Chicago, IL, on Friday, August 24, and asking for Seed confidential information.

     i.     Purposefully directing hundreds of calls to Seed employees, all of whom are located in Chicago.

     j.     Purposefully directing thousands of emails and Slack messages to Seed employees, all of whom are located in Chicago.

17.     This Court has subject matter jurisdiction over Seed's DTSA claim under 18 U.S.C. § 1830 *et seq.*, because that claim arises under the laws of the United States.

18.     This Court has jurisdiction over Claims 2 through 5 under 28 U.S.C. § 1367 because the claims are substantially related to Claim 1, arise under the same set of operative facts, and form part of the same case or controversy under Article III of the United States Constitution.

19.     Venue is proper in this Court under 28 U.S.C. § 1391, which provides for venue in federal court generally because "a substantial part of the events or omissions giving rise to the claim occurred" in the Northern District of Illinois, including:

        a.     Andersson worked for Seed, which is located in this District from 2015-2018.

        b.     Andersson met Seed's investor and future customer in Seed's Chicago office on August 6, 2018.

        c.     Andersson contacted two Seed employees, who he knew to be located in this District, on August 24, 2018 to obtain Seed's confidential and propriety information.

        d.     Seed is suffering the harm caused by Andersson's breach and misappropriation in this District, where Seed's headquarters is located.

        e.     For the reasons listed *infra* Paragraph 5.

## FACTUAL BACKGROUND

### I.     Seed

20.     Seed is a Chicago based startup building a trading platform on which institutional traders can trade and exchange digital assets, such as Bitcoin or other crypto-based assets.[2] Digital assets are an emerging technology, and people are finding new uses and applications every day. As a result, the technology and the tradable assets themselves have drawn increasing interest from investors, traders, banks, and startup companies.

21.     Seed has developed the regulatory infrastructure, systems and technology that allows for the exchange and settlement of digital assets on its trading platform. Generally, an exchange matches buyers and sellers and then settles the trade. "Settling" a trade occurs after the trade of a

---

[2] The following paragraphs setting out the allegations in this verified complaint are taken from the Declaration of Edward Woodford, which is being simultaneously filed as a part of Seed CX's Emergency Motion for a Temporary Restraining Order and Preliminary Injunction.

particular digital asset, and Seed manages the payments and movements of that asset. For example, a seller may be offering a single Bitcoin for $5,000, and a buyer wants to buy the Bitcoin at that price. Seed offers a number of ways in which this buyer and seller can be matched, and, once they are matched, Seed would facilitate the transfer of $5,000 to the seller and the single Bitcoin to the buyer. In addition, Seed will also allow buyers to purchase digital assets on margin. If a seller is offering one Bitcoin for $5,000, a buyer can enter an order and execute a trade to purchase that Bitcoin with less than the full $5,000 in her account (e.g., if $2,500 is in the buyer's account, this would represent a 50% margin trade), although the buyer would still need to deliver the full $5,000 to complete the settlement of the transaction. Seed will also allow collateral to be posted not only in dollars but also in digital assets.

22.     Establishing these exchanges involves merging traditional markets and regulations with an entirely new kind of asset that poses unique regulatory and technological challenges.

23.     Getting a trading platform for digital assets to work has required Seed to solve several business and technological problems. Among these problems are finding ways to manage the risks associated with digital asset trading (including issues such as parties that default on their commitments or the use of digital assets as collateral), storing and accounting for digital assets, and obtaining funding and investors willing to take a risk on an unproven company in a new market.

24.     Seed is different from other companies because it is providing an exchange or trading platform for institutional investors. In simple terms, a given exchange's primary customers are either retail or institutional. A retail exchange focuses on individual or smaller investors. Institutional exchanges involve larger investors, who typically own a much higher amount of a given asset. In addition, institutional investors make larger, more complex transactions, such as buying on margin or trading derivatives. This in turn places a greater strain on the company to figure out how to make these transactions possible in the first place while ensuring the integrity of the process and

Seed's own profitability. Finally, Seed's system must work with the other computer systems that institutional investors use.

25.     These transactions are made more complicated by the unique features of digital assets. One such feature is the existence and use of a unique "private key" associated with each asset, which is used to secure the asset. These private keys are used to verify transactions and to enable secure movements between buyers and sellers. A digital exchange typically has to "hold" digital assets for customers in order to allow for efficient trading and settlement of such digital assets. Another feature of digital assets is the publicly available ledger that maintains all movements. Every transaction that results in a ledger update is mathematically verified. Building systems and working with vendors to store digital assets, interacting with the blockchain and updating that ledger to reflect executed transactions are unique technical challenges that Seed has had to overcome.

26.     Because it is a financial exchange, Seed is heavily regulated. It is essential to Seed's business that it satisfy federal and state regulations governing exchanges. Part of the challenge in setting up the business has been finding a way to fit a twenty-first century asset into established regulations. Navigating federal and state regulatory requirements has been essential to Seed's success and to differentiate the company from others. Thus, Seed has a Swap Execution Facility that is regulated by the Commodity Futures Trading Commission (CFTC), and European regulators also recognize the registration status. Seed is in the final stages of preparing a registration with FINRA as a broker-dealer. Because Seed settles transactions involving both "fiat" assets (e.g., the U.S. Dollar) and crypto, it is a regulated Money Service Business with the U.S. Treasury Department's Financial Crimes Enforcement Network (FinCEN) and is approved as a Money Transmitter in several states. Seed also has a licensed Introducing Broker with the National Futures Association. In order to obtain these registrations or approvals, Seed has invested substantial time and money in both understanding the requirements for registration and structuring Seed's business to ensure ongoing

7

compliance, which is viewed as one of Seed's key competitive edges in the sector. The company's investment has been high because of the unique challenges posed by digital or crypto assets.

27.     Seed is exposed to many of the challenges that face any new technology company. Seed has successfully closed multiple rounds of funding with venture-capital firms. It is currently in the process of closing another round. Seed is discreet with the identity of its funders until the round is closed and publicly announced. Venture capital firms invest money with the anticipation of a certain life expectancy of the company given the funds and known expenses, after which they reevaluate the company and the market to decide whether to invest more. If an investor decides not to continue with its investment, that decision can be hard for a startup like Seed to overcome. Not only would there be the loss of new funds and technical contributions from investors, and the potential growth that would come along with said investment, but an investor not re-investing is often seen as a negative signal to other would-be investors. Most immediately, the company loses money to grow or fund operations. In turn, that can affect the willingness of current customers to remain with the company or can prevent the company from attracting enough customers to get off the ground. The decision to withdraw can also send a negative signal to other actual or potential funders. In effect, when a company that had once funded a startup decides to stop doing so, in my experience other investors will stay away. Furthermore, Seed relies on its funders to allocate their limited time to help it succeed. Investors' goodwill is crucial to Seed's future.

28.     It took Seed's co-founders years to develop the relationships with individual venture capital firms they needed to fund the company. Most if not all of Seed's investors are future customers. Because Seed is an institutional platform, the same companies that are investing in Seed's development will one day use the platform for their own institutional trading. As a result, the goodwill that Seed has developed with these funders is essential to Seed's ongoing and future operations because, without it, Seed will alienate its future customer base.

8

29.     Finally, institutional investors require that an exchange provide a way to convert a digital asset (like Bitcoin) into a "fiat" asset (such as the U.S. dollar). That requires Seed to develop strong relationships with banks, which can hold the fiat assets. Whether a specific bank is involved with crypto assets or crypto companies is not generally known because banks do not disclose their customer base and typically do not release their position on businesses involved in digital assets. Seed only established these relationships through extensive networking and through the founders' connections and social capital. The relationships that Seed has developed with these banks are in turn essential to Seed providing the services its investors and customers require.

**II.     Relationship with Russell Andersson**

30.     Seed is a startup and a small company. It has to use consultants to develop its business. Hiring a consultant is usually less expensive than hiring a full-time employee and provides greater flexibility to the company. Consultants normally have industry experience that is relevant to problems that the startup is facing. It is a balancing act having a consultant, however. Startups want to provide full access to the company so that the consultant can provide the best advice possible. But they also do not want to teach the consultant how to be a future competitor. Because Seed is new and small, its biggest asset as a company is the work it has been doing, and Seed takes pains to protect that work.

31.     To protect its confidential and proprietary information, including trade secrets, Seed: requires strong passwords be used and be changed periodically; enforces two factor authentication as a pre-requisite to access its data and programs; uses Google Vault to keep an immutable record of all communications made by employees and consultants; maintains logs and audits to track every view of every document; runs periodic and independent cyber tests; restricts its trade operations to non-employees, which Seed implemented for CFTC compliance; requires all employees and consultants to sign an NDA; requires investors to sign NDAs to get access to confidential data

about the company; and, maintains an internal and external legal team to review contracts for confidentiality clauses.

32.     Seed hired Russell Andersson in 2015 as a consultant. Seed retained Andersson because of his background with exchanges generally, but, on information and belief, he did not have a background in digital assets.

33.     Seed and Andersson entered into a Consulting Agreement on September 1, 2015 ("2015 Agreement"). Ex. 1. 2015 Agreement at 1. The 2015 Agreement set forth the work that Andersson would be doing for Seed and the terms governing that work. In addition to other services, Andersson would be providing "ad hoc consulting and advice as requested from time to time by the Company." Ex. 1, 2015 Agreement, Ex. A. The 2015 Agreement had both a non-compete and a confidentiality clause. *Id.* at 1, 3.

34.     The non-compete clause prevented Andersson from competing for a year after termination of the agreement:

> In order to protect the Company's Confidential Information and goodwill during the term of this Agreement and for a period of twelve (12) months thereafter ("the Restricted Period"), Consultant will not, directly or indirectly, otherwise[] engage, participate or invest in any business activity, in a competitive capacity, anywhere that the Company conducts business or proposes to conduct business, to the extent such business activity is competitive with the products or services of the Company or products or services that the Company has under development or that are the subject of active planning;

*Id.* at 3.

35.     In April 2018, Andersson formally terminated his relationship with Seed. Ex. 2, 2018 Agreement at 1. But the next month, the parties entered into a new Amended and Restate [sic] Consulting Agreement ("2018 Agreement"). The 2018 Agreement required Andersson to perform various services to support the company's ongoing development. *Id.* at Schedule A. In exchange, Seed paid Andersson a lump sum for two months of work and an hourly rate otherwise. *Id.* The

2018 Agreement also required Andersson to be in Chicago for at least three days a month in July

and August 2018.

36.     The 2018 Agreement has a non-solicitation provision. The terms of the non-

solicitation provision in the 2018 Agreement prohibit soliciting Seed's customers and seeking to

divert Seed's business:

> In order to protect the Company's Confidential Information and
> good will, during the term of this Agreement and for a period of
> twelve (12) months thereafter (the "Restricted Period") [sic] During
> the Restricted Period, Consultant will not, directly or indirectly, in
> any manner, other than for the benefit of the Company, (a) call upon,
> solicit, divert or take away any of the customers, business or
> prospective customers of the Company or any of its suppliers,
> and/or (b) solicit, entice or attempt to persuade any other employee
> or consultant of the Company to leave the services of the Company
> for any reason.

Ex. 2, 2018 Agreement at 3.

37.     The 2018 Agreement also restricted Andersson's ability to use Seed's confidential

information. *Id.* at 1. The 2018 Agreement broadly defines Confidential Information as follows:

> "Confidential Information" means all information, whether or not in
> writing, concerning the Company's business, technology, business
> relationships or financial affairs which the Company has not released
> to the general public.  By way of illustration, Confidential
> Information may include information or material which has not been
> made generally available to the public, such as:  (a) *corporate information*,
> including plans, strategies, methods, policies, resolutions, negotiations
> or litigation; (b) *marketing information*, including strategies, methods,
> customer identities or other information about customers, prospect
> identities or other information about prospects, or market analyses or
> projections; (c) *financial information*, including cost and performance
> data, debt arrangements, equity structure, investors and holdings,
> purchasing and sales data and price lists; and (d) *operational and
> technological information*, including plans, specifications, manuals, forms,
> templates, software, designs, methods, procedures, formulas,
> discoveries, inventions, improvements, concepts and ideas; and (e)
> *personnel information*, including personnel lists, reporting or
> organizational structure, resumes, personnel data, compensation
> structure, performance evaluations and termination arrangements or
> documents.  Confidential Information also includes information

> received in confidence by the Company from its customers or
> suppliers or other third parties.

*Id.*

38.     The 2018 Agreement then prohibits Andersson from using Confidential Information for any purpose other than working on Seed's behalf. *Id.*

> Consultant will not, at any time, without the Company's prior written
> permission, either during or after the term of this Agreement,
> disclose any Confidential Information to anyone outside of the
> Company, or use or permit to be used any Confidential Information
> for any purpose other than the performance of the Services for or on
> behalf of the Company.

*Id.*

39.     In addition to the agreements above, the parties also had a Mutual Non-Disclosure Agreement (MNDA) from August 2015. The Agreement is for the Purpose of Andersson collaborating with Seed regarding Seed's "platform, contract specifications and the sharing of expertise of the futures market." Ex. 3, Mutual Non-Disclosure Agreement at 2. Confidential Information includes "any information or data disclosed in connection with the Purpose, including business information relating to proprietary ideas, patentable ideas, existing and/or contemplated products and services, . . . costs, profit and margin information, finances and financial projections, clients, marketing and business plans and models. . . ." *Id.* The Agreement requires that Andersson "use" Seed's confidential information "for the Purpose and make no commercial use of the same or any part thereof without [Seed's] prior written consent. . . ." *Id.* at 3. The MNDA's term is "from the date of signing this MNDA and for a period of three (3) years from the termination of this MNDA." The MNDA terminated when Andersson terminated the relationship with Seed in April 2018.

40.     As part of Andersson's relationship with Seed under the 2015 and 2018 Agreements, Andersson had access to Seed's confidential technical, financial, and strategic information. For

example, he was granted one of the widest accesses of all employees and consultants on Seed's data storage systems Google Drive and Confluence. He had administrative rights to Seed's customer relationship management database, which included information on all its customers and contact details.

### III.  Mr. Andersson's New Business

41.     On Friday, August 24, 2018, a Seed board member received an email from one of Seed's investors and potential future customers. The investor stated that he had received an email from Andersson regarding a new business venture that was very similar to Seed's. The board member subsequently sent "screenshots" of the email to Seed's CEO, Edward Woodford, via text. Ex. 4.

42.     Seed is discreet as to the identities of its funders, and this funder in particular. Seed competes with other startups for the limited amount of capital that exists to invest in startups generally and crypto companies in particular. Andersson learned the identity of Seed's funders and their interest in the digital asset space as part of his consulting relationship with Seed. As a result, Andersson developed relationships with Seed's contacts there. He personally met the individual from the investment group who he contacted via email on August 24th just a few weeks earlier, on August 6th, at Seed's offices in Chicago, IL. He also had administrative rights to Seed's customer relationship management database, which provides the identities of all its customers. And he had access to Seed's Google Drive and was often asked to assist in diligence requests from potential investors and as such knew the identities of investors and customers.

43.     Andersson's proposed business is very similar to Seed's. The title of Andersson's presentation was Chicago Digital Asset Exchange. Ex. 5. Seed is also a Digital Asset Exchange based in Chicago. Andersson has no known current connection with Chicago other than his relationship with Seed.

13

44. On information and belief, Andersson also registered the domain name ChicagoDigitalAssetExchange.com for his company on August 11, 2018. Ex. 6.

45. Although he had been working with Seed for three years, he stated in his August 24th email to Seed's investor that "[w]hile there is a lot of noise / activity in the space, nobody seems to be making any meaningful regulatory progress and many of these competitive teams are facing fundamental blockers around clearing [transactions] mainly." Ex. 4 He stated that he had "solutions to the clearing issue, the shorting issue, the margin issue, and other challenges and ha[d] developed a vastly superior exchange / clearing model. It's quick, inexpensive to build, fast to regulate, easy to access, compresses liquidity, etc. and provides numerous other customer benefits that I will profile for you. Its [sic] vastly superior to anything that I have seen announced or unannounced . . . this model could own the crypto derivatives space, and has unicorn potential." He said that the investor would "learn a lot about exchanges that may help you in evaluating other parts of your portfolio and overseeing Seed."

46. Seed's CEO, Mr. Woodford, approached Andersson about this email on the same evening, Friday, August 24th. The next day, Seed's President and co-founder, Brian Liston, spoke with Andersson via telephone. Mr. Liston stated that it appeared that Andersson intentionally went behind the backs of Seed and its employees, to start his company and contact Seed's investor, to which Andersson agreed, stating "Yeah, I did." Andersson further stated that he "doesn't want [his] hands tied by our legal relationship," but admitted that "the whole situation with [the investor] is conflicted. [He] will go elsewhere." Ex. 7.

47. On Sunday, August 26th, Mr. Woodford and Mr. Liston arranged to see the presentation that Andersson intended to present to Seed's investor and future customer the next day. Andersson did not send the presentation to Seed's co-founders but instead showed them the presentation via an online screenshare. Because they did not have a copy of the presentation, Seed's

14

co-founders took screenshots of the slides as they were presented. Those screenshots are attached as Ex. 5.

48.     Andersson's plan is to build an exchange and settlement platform for digital assets. He intends to focus on institutional clients and sees obtaining regulatory licenses as a key to the success of the business. Ex. 5 at 3. This is directly competitive to Seed's own business plan. And while Andersson plans to obtain different licenses to those that Seed currently has, Andersson acknowledges that all of these trading licenses and constructs are comparable and competitive, including those that Seed owns and operates.  Ex. 5 at 7.

49.     Through this presentation, it was clear to Seed's co-founders that Andersson intended to present a business plan to Seed's investor and future customer that directly competed with Seed's current and planned offerings. This is based on several aspects of the presentation that reflect programs that Seed had in place or in development.

50.     There are several slides in which Andersson describes his proposed business model that track areas in which Seed currently operates or plans to operate, and relationships that Seed has developed that Andersson only obtained through his relationship with Seed.

51.     In his presentation to Seed's investor and prospective customer, Andersson described his business model as the "ultimate long term solution." His business plan is almost entirely based on and informed by Seed's work and development in this area, including but not limited to the following areas:

   a.     "Direct Access to the widest customer base (Min Deposit $250k)" (Ex. 5 at 15): Andersson's proposed business would compete directly with Seed to obtain institutional investors, which are the types of customers that would maintain at least this minimum deposit of $250,000. Andersson's claimed focus is also reflected in his August 24, 2018 email with Seed's institutional investor and a future customer. As

15

discussed above, Seed has invested significant time and effort to determine how to scale a digital asset exchange to accommodate institutional investors, and Andersson had access to and knowledge of Seed's business model, core customers, and related features. Seed has also invested time and energy to develop the goodwill that exists with its current investors and future customers. Andersson directly targeted the investor and customer that Seed considers its 'flagship' investor and customer. Having a current consultant who Seed introduced to the investor turn around and approach the investor with a competitive business damaged Seed's goodwill with its flagship investor and customer. Seed relies on its investors to make introductions to other investors and potential customers, as well as potential employees. Andersson's actions diminished Seed's flagship investor's confidence in it. Moreover, Andersson seems to suggest that his pre-Seed experience is transferable to securing institutional investors, but his focus at Nadex (where he worked earlier in his career and references several times in his presentation) was on retail investors. These customer bases are different.

b.      Competitive Landscape and Sales and Strategy Data: On August 24th, Andersson solicited an employee of Seed's through the communication program Slack for a competitive landscape writeup, three hours after he contacted Seed's investor to discuss his new company. Ex. 8. Specifically, he asked the junior Seed employee for a "comscape" or a landscape of Seed's competitors. He asked whether the junior Seed employee knew if any other Seed employees could pull the information together for him. Finally, he asked for the "high points" of the weekly sales and strategy update. On information and belief, Andersson used his seniority at

16

Seed to request this information from the most junior person on the strategy side of the business for use in his presentation to Seed's investor.

c.    Andersson also had access to Seed's business strategy and budgeting information. Because Seed is regulated, Seed has needed to figure out how to staff the company to comply with the relevant regulations and ultimately execute upon its vision in the most efficient way possible. In Andersson's presentation he used projected numbers that are nearly identical to Seed's.

52.    In his presentation, Andersson also touts his access to several areas of "secret sauce" necessary for a successful digital asset exchange. Ex. 5. at 13 These areas are directly related to Seed's work in this space and reflect knowledge and information Andersson gained at Seed:

a.    New Risk Management Approaches (Id.): Seed's margining system and its process is not generally known and is a central limitation on the ability of the margining of digital assets (as discussed above in paragraphs 21and 24). To develop and verify these models, Seed has had to buy, structure, and aggregate large amounts of data. It then had to back-test its work to verify the assumptions that allow Seed to match buyers and sellers, including models that allow it to assess the relative creditworthiness of market participants. At one point in the presentation, Andersson touts the need for new "margin models." A margin model is the way in which exchanges like Seed evaluate how much money or digital assets a person on the exchange must have on hand for the exchange to allow that person to trade on margin. Andersson states that one type of model (a VAR) is "outdated" and that it is necessary to use a different kind (Monte Carlo). In a general sense, a Monte Carlo-based model or analysis is not specific to Seed or crypto. A Monte Carlo method is a type of algorithm for modeling market behavior. However, a Monte Carlo method

does not do much without underlying data that reflects market or exchange behavior. In order to create its model, Seed aggregated and analyzed data from a variety of different markets and exchanges to create a model that it uses in Seed's current and future offerings. To do so, Seed hired a quantitative analyst ("quant") to conduct the analysis, including the Monte Carlo modelling. Seed purchased data and spent significant time coding for the model to function. Seed has also developed a system by which it can assess the risk of an individual in the market based on crypto holdings and other metrics, which reflects its specific grading of clients and the idiosyncratic risks around crypto holdings.

b.        On information and belief, Andersson tried to obtain Seed's model for use in his new venture. On August 16, 2018, Andersson downloaded a set of Seed's historical data and related modeling. Prior to this, to Seed's knowledge and belief, Andersson was not involved in Seed's modeling. And on Friday, August 24, 2018, Andersson communicated privately using the communication program Slack with an employee at Seed who developed Seed's Monte Carlo model. Ex. 9. The Seed employee had given a presentation describing the model. Andersson asked the employee several questions about how Seed developed aspects of its Monte Carlo model, asked for the modeling information from the presentation in a spreadsheet format (which makes it more usable), and inquired into the tool and date that Seed used to arrive at its model. Notably, this communication with the Seed employee occurred an hour and a half after Andersson emailed Seed's investor and future customer to tell him about his new business. In his presentation, Andersson identified Smart Clearing and Margin—the subjects of Seed's Monte Carlo analysis—as a large part of the value of his new company. He referred to this as "Lots more

18

secret sauce!" (Ex. 5 at 15), which, on information and belief, means that the secrecy of the information regarding smart clearing and margin provide a competitive advantage because they are kept secret.

     (1) Andersson knew the economic value and confidential nature of this data, processes and model to Seed; he had personally engaged counsel and threatened in writing to sue a former partner of Seed who he believed was about to misappropriate the same confidential and proprietary information.

c.     "Smart Ledgering": Seed has spent a great deal of time and money to develop its ability to optimize the ledgering of digital assets for institutional clients. In his presentation, Andersson refers to Smart Ledgering as "More secret sauce." Ex. 5 at 15. Indeed, Seed has kept its process and technology regarding how it "ledgers" transactions confidential and proprietary, and it is essential to its competitive position in the market to continue to do so. On information and belief, Andersson had no experience with crypto assets, let alone digital and smart ledgering, before joining Seed.

d.     Default Management and Default Derivatives for Guarantee Fund (Ex. 5 at 13): On July 5, 2018, Seed's CEO forwarded to Andersson via email, a detailed spec, tilted "Basic Start to Default Fund Solution," that Seed employees had created to explain Seed's idea and its implementation. Andersson replied that he would be "happy to review and add inputs." Andersson complimented Seed that the company had identified and potentially solved a "huge issue that prevents institutional adoption." Ex. 10. Andersson claims in his presentation that he now has the "secret sauce" for a default solution and claims it is patentable. Ex. 5 at 13. Yet, on information and belief, even at the time of this complaint, Andersson does not

19

understand how this concept will fit into the existing regulatory construct. The only way he could have learned this is from his time at Seed, based on the work of Seed employees.

e. "Expansive Fiat Based Omnibus Relationships ('bankchaining')" (Id. at 15): As discussed above, a digital asset exchange for institutional clients requires relationships with banks in order to exchange a digital asset (like Bitcoin) for a fiat currency (like the U.S. Dollar). Seed has developed relationships with several banks in developing its business. Andersson knows the identity of these banks based on his work with Seed. The identity of the banks with which Seed has these relationships is not currently known.

53. There are other types of programs and trades that Seed is developing that Andersson featured in his pitch deck. Ex. 5 at 9 (Root Cause 2-- lending). For example, a repurchase agreement or "repo" is a transaction where a seller agrees to sell an asset at one date for a certain price and then repurchase that asset at a later date from the buyer for a different price. It is essentially a type of loan where (at Seed) a digital asset is a form of collateral for the loan. Seed has spent time, money, and effort to figure out how repo works with digital assets. There are specific issues relating to digital assets that make implementing repos difficult, and Seed has invested heavily in figuring out solutions to these issues. For example, as discussed above, managing private keys poses a technical and business challenge. Seed invested money to figure out the regulatory issues. And Seed invested money on the implementation to tailor and customize the International Swaps and Derivatives Association (ISDA) agreement for digital assets. Fitting Seed's repo transactions into the terms of the Agreement and operationalizing these trades required Seed to invest considerable resources. On information and belief, Andersson had no prior experience with this process, yet he included it in his presentation.

54. On information and belief, Andersson met with Seed's investor and future customer on August 27, 2018 to present his idea for a company that is directly competitive to Seed.

55. On information and belief, Andersson met with legal counsel on August 30, 2018 to discuss securing intellectual property rights on the ideas he took from Seed.

## Count One: Violation of 18 U.S.C. § 1830, *et seq.*

56. The allegations of paragraphs 1 through 55 are re-alleged and incorporated as set forth verbatim herein for the purposes of alleging a claim violation of 18 U.S.C. § 1830*, et seq.* against Andersson.

57. The Defend Trade Secrets Act ("DTSA") defines a "trade secret" as "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes" if "(A) the owner thereof has taken reasonable measures to keep such information secret; and (B)the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information" 18 U.S.C. § 1839 (3).

58. A person engages in misappropriation under DTSA, if he:

    a. With intent to convert a trade secret, that is related to a product or service used in or intended for use in interstate or foreign commerce, to the economic benefit of anyone other than the owner thereof, and intending or knowing that the offense will, injure any owner of that trade secret, knowingly—(1) appropriated, took, carried away, or concealed, or by fraud, artifice, or deception obtained such information; (2) without authorization copied, duplicated, sketched, drew, downloaded, uploaded, altered, photocopied, replicated, transmitted, delivered, sent,

mailed, communicated, and conveyed such information; (3) received, possessed such information, knowing the same to have been stolen or appropriated, obtained, or converted without authorization; (4) attempted to commit those acts described in paragraphs (1) through (3). 18 U.S.C. § 1832(a).

59. Seed took affirmative measures to keep its confidential and proprietary information secret, including using significant internal and external security measures and requiring its employees and consultants to enter into Non-Disclosure Agreements. See *infra* at Paragraph 31. Andersson was and is aware of the highly confidential and secret nature of the confidential and proprietary information.

60. The data that Seed maintained and that was stolen, copied and misappropriated by Andersson included sensitive and confidential financial and investment data about the business operations of Seed, including proprietary financial and operations information, processes, competitive market analysis compiled by Seed and its employees, customer information, and investor information, among other things.

61. That data and those files and information constitute trade secrets under DTSA.

62. Despite the statutory obligations to maintain the confidentiality of such trade secrets, Andersson maliciously misappropriated such trade secrets in violation of the DTSA.

63. Section 18 U.S.C. § 1836(b)(1) & (3)(A) provides Seed with an appropriate civil remedy against Andersson for his wrongdoing, including the grant of injunctive relief both prohibiting continued misuse of the trade secrets and requiring protective measures.

64. Seed has no adequate remedy at law to protect against the illegal misappropriation and use of its trade secrets by Andersson. Injunctive relief is therefore necessary and appropriate to restrain the illegal misappropriation and use of such information.

65. Unless Andersson is restrained and enjoined from using the subject confidential, proprietary and trade secret information, Seed will suffer immediate and irreparable injury in that Andersson will continue to have access and the ability to make use of Seed's trade secrets in a competing venture to the detriment of Seed's competitive standing and its goodwill.

66. Section 18 U.S.C. § 1836(3)(B) provides for the damages for actual loss caused by the misappropriation of the trade secret; and damages for any unjust enrichment caused by the misappropriation of the trade secret that is not addressed in computing damages for actual loss; or in lieu of damages measured by any other methods, the damages caused by the misappropriation measured by imposition of liability for a reasonable royalty for the misappropriator's unauthorized disclosure or use of the trade secret.

67. As a direct and proximate result of Andersson's misappropriation of Seed's trade secrets, Seed has suffered damages in an amount yet to be determined (albeit not sufficient to remedy the harm caused by Andersson's misappropriation), and Andersson has been unjustly enriched through his use of such information. Therefore, under 18 U.S.C. § 1836(3)(B) of DTSA, Seed is entitled to recover damages.

68. Section 18 U.S.C. § 1836(c) grants this Court jurisdiction over such claim.

**<u>Count Two: Illinois Trade Secret Act, 765 ILCS 1065/1, <em>et seq.</em></u>**

69. The allegations of paragraphs 1 through 68 are re-alleged and incorporated as set forth verbatim herein for the purposes of alleging a claim for violation of the Illinois Trade Secret Act ("ITSA") against Andersson.

70. The ITSA defines a "trade secret" as information "including, but not limited to technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers" that is (a) sufficient secret to derive economic value . . . from not being generally known to other persons

who can obtain economic value from its disclosure or use; and (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality. 765 ILCS 1065/2(d).

71.     A person misappropriates a trade secret by, among other things, disclosing the trade secret despite knowing that it was "acquired under circumstances giving rise to a duty to maintain its secrecy or limits its use" or from a person who had a duty to maintain its secrecy or use. 765 ILCS 1065/2(b)(2)(B)(II) and (III).

72.     Seed took affirmative measures to keep its confidential and proprietary information secret, including using significant internal and external security measures and requiring its employees and consultants to enter into Non-Disclosure Agreements. See *infra* at Paragraph 31. Andersson was and is aware of the highly confidential and secret nature of the confidential and proprietary information.

73.     The data that Seed maintained and that was stolen, copied and misappropriated by Andersson included sensitive and confidential financial and investment data about the business operations of Seed, including proprietary financial and operations information, competitive market analysis compiled by Seed and its employees, customer information, and investor information, among other things.

74.     That data and those files and information constitute trade secrets under ITSA whose actual and threatened misappropriation may be enjoined.

75.     Despite the statutory obligations to maintain the confidentiality of such trade secrets, Andersson maliciously misappropriated such trade secrets in violation of the ITSA.

76.     The ITSA authorizes injunctive and other relief to remedy "actual or threatened misappropriation" of trade secrets. 765 ILCS 1065/3(a). Illinois law permits injunctive relief upon a showing that a person's new employment will inevitably lead him or her to rely on the trade secrets.

24

77.     Seed has no adequate remedy at law to protect against the illegal misappropriation and use of its trade secrets by Andersson. Injunctive relief is therefore necessary and appropriate to restrain the illegal misappropriation and use of such information.

78.     Unless Andersson is restrained and enjoined from using the subject confidential, proprietary and trade secret information, Seed will suffer immediate and irreparable injury because Andersson will continue to have access and the ability to make use of Seed's trade secrets.

79.     As a direct and proximate result of Andersson misappropriation of Seed's trade secrets, Seed has suffered damages in an amount yet to be determined (albeit not sufficient to remedy the harm caused by Andersson's misappropriation), and Andersson has been unjustly enriched through their use of such information. Therefore, pursuant to section 4 of the ITSA, Seed is entitled to recover damages.

**Count Three: Breach of the Parties' 2015 Contract**

80.     The allegations of paragraphs 1 through 79 are re-alleged and incorporated as set forth verbatim herein for the purposes of alleging a claim for breach of contract against Andersson.

81.     Seed and Defendant Health Care Analytics, LLC are parties to the 2015 Consulting Agreement, which is a valid and enforceable contract covering the parties' rights and duties with respect to the Company.

82.     Defendant Andersson signed the agreement on behalf of Health Care Analytics.

83.     The 2015 Agreement is enforceable and the confidentiality (Paragraph 2) and non-compete (Paragraph 5) provisions are reasonable.

84.     The non-compete provision was reasonable in temporal duration and geographic scope and advanced a legitimate economic interest of Seed.

85.     Andersson agreed to the confidentiality and non-compete provisions in exchange for payment.

25

86. At all relevant times, Seed performed under the 2015 Agreement or was excused from performance.

87. For the reasons alleged above, Andersson breached the 2015 Agreement by, among other things,

      a. violating Paragraph 2, "Confidentiality"

      b. violating Paragraph 5, "Conflicting Obligations and other covenants"

88. As a direct and proximate cause of Andersson's acts and omissions, Seed has been and will continue to be injured.

### Count Four: Breach of the Parties' 2018 Contract

89. The allegations of paragraphs 1 through 88 are re-alleged and incorporated as set forth verbatim herein for the purposes of alleging a claim for breach of contract against Andersson.

90. Seed and Defendant Health Care Analytics, LLC are parties to the 2018 Agreement, which is a valid and enforceable contract covering the parties' rights and duties with respect to the Company.

91. Defendant Mr. Andersson signed the agreement on behalf of Health Care Analytics.

92. The 2018 Agreement is enforceable and the confidentiality (Paragraph 3) and non-solicitation (Paragraph 6) provisions are reasonable.

93. The non-solicitation provision was reasonable in temporal duration and geographic scope and advanced a legitimate economic interest of Seed.

94. Andersson agreed to the confidentiality and non-solicit provisions in exchange for payment.

95. At all relevant times, Seed performed under the 2018 Agreement or was excused from performance.

26

96. For the reasons alleged above, Andersson breached the 2018 Agreement by, among other things,

      a.    violating Paragraph 3, "Confidentiality"

      b.    violating Paragraph 6, "Conflicting Obligations and other covenants"

97. As a direct and proximate cause of Andersson's acts and omissions, Seed has been and will continue to be injured.

### Count Five: Breach of the Parties' MNDA

98. The allegations of paragraphs 1 through 97 are re-alleged and incorporated as set forth verbatim herein for the purposes of alleging a claim for breach of contract against Andersson, in his individual capacity.

99. Seed and Defendant Andersson (but not Health Care Analytics, LLC) are parties to the MNDA, which is a valid and enforceable contract covering the parties' rights and duties with respect to Seed.

100. Defendant Mr. Andersson signed the agreement on August 24, 2018.

101. The MNDA is enforceable and the confidentiality provision is reasonable.

102. Andersson agreed to the MNDA as a condition of his consulting relationship with Seed.

103. At all relevant times, Seed performed under the MNDA or was excused from performance.

104. For the reasons alleged above, Andersson breached the MNDA by, among other things violating the confidentiality provisions, as set forth above.

105. As a direct and proximate cause of Andersson's acts and omissions, Seed has been and will continue to be injured.

## PRAYER FOR RELIEF

106. For each Count, Seed respectfully request that the Court enter judgement in its favor and against the Andersson in the following amounts:

a. A temporary restraining order, and thereafter a preliminary and permanent injunction be entered restraining and enjoining Andersson from using or disclosing any information that he improperly obtained;

b. That a temporary restraining order, and thereafter, a preliminary and permanent injunction be entered restraining and enjoining Andersson or any other person acting with or for them from contacting any investors, customers, or future customers and transmitting any of the information that Andersson accessed, transferred or downloaded in violation of the DTSA;

c. That a temporary restraining order, and thereafter, a preliminary and permanent injunction be entered enjoining and restraining Andersson from misappropriating and using the confidential and/or proprietary information alleged herein;

d. That a mandatory injunction order be issued requiring Andersson to return to Seed any and all written materials, including copies thereof, and/or computer disks, diskettes, databases and/or other retrievable data (whether encoded, taped, code electronically, electromagnetically, or otherwise) which reflect, refer or relate to the confidential and/or proprietary information, and any copies thereof that may be in their possession, or to which they may have access;

e. That the Court grant additional relief to Seed, including:

i. an accounting of monies obtained through Andersson's wrongful acts,

ii.    disgorgement of the monies obtained through his wrongful acts,

iii.   lost profits incurred by Seed as a result of Andersson's wrongful acts

iv.    compensatory damages, including those provide under 765 ILCS

1065/4, in an amount to be determined at trial, but greater than $75,000,

v.     punitive damages,

vi.    attorneys' fees,

vii.   costs, including those costs incurred in the forensic imaging and

investigation of any computer systems, and

viii.  such other and further relief as justice may require.

107.   Seed demands a jury trial on all issues so triable.

Dated:  September 4, 2018                    Respectfully Submitted,

                                             By:  /s/ *Katharine A. Roin*

                                                  Matthew R. Ford (ARDC# 6292833)
                                                  matthew.ford@bartlit-beck.com
                                                  Katharine A. Roin (ARDC# 6302872)
                                                  kate.roin@bartlit-beck.com
                                                  Bartlit Beck Herman Palenchar & Scott LLP
                                                  54 West Hubbard Street, Suite 300
                                                  Chicago, IL 60654
                                                  Phone: (312) 494-4400
                                                  Facsimile: (312) 494-4440

                                                  *Attorneys for Plaintiff*

## CERTIFICATION

Under penalties as provided by law pursuant to 28 U.S.C. § 1746, the undersigned certifies under penalty of perjury that the foregoing is true and correct, except as to matter therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that he verily believes the same to be true.

Dated: September 4, 2018

Edward Woodford

Title: CEO

**CERTIFICATE OF SERVICE**

I, Katharine A. Roin, hereby certify that on September 4, 2018, I filed a true and correct copy of the foregoing document using the Court's CM/ECF system, which will cause a Notice of Electronic Filing to be sent to all counsel of record.

By: _/s/ Katharine A. Roin_

Katharine A. Roin (ARDC# 6302872)
kate.roin@bartlit-beck.com
Bartlit Beck Herman Palenchar & Scott LLP
54 West Hubbard Street, Suite 300
Chicago, IL 60654
Phone: (312) 494-4400

*Attorney for Plaintiff*