**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| SEED CX LTD. <br><br>      Plaintiff, <br><br> v. <br><br> RUSSELL ANDERSSON and HEALTH CARE ANALYTICS, LLC. <br><br>      Defendants. | Case No. 18-cv-6022 <br><br> The Hon. Edmond E. Chang |

**SEED CX LTD.'S MEMORANDUM OF LAW IN SUPPORT OF EMERGENCY
MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY
INJUNCTION**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. iii

FACTUAL BACKGROUND ................................................................................................... 2

I.  Seed CX is a digital-asset exchange that its founders built from scratch ..................... 2

II.  Andersson is a consultant that Seed hired to help develop its business ....................... 4

III.  Andersson downloaded Seed's trade secrets and used the confidential information he
learned as part of the consulting relationship to pitch his own digital-asset exchange
to Seed's flagship investor and customer ..................................................................... 6

ARGUMENT .......................................................................................................................... 10

I.  Seed has a substantial likelihood of success on the merits ........................................ 11

    A.  Breach of the 2015 Agreement ............................................................................ 11

        1.  The 2015 Agreement is a valid contract that Andersson terminated in
April 2018 ............................................................................................. 11

        2.  The 2015 Agreement has a non-compete provision ................................ 12

        3.  Andersson breached the 2015 Agreement's non-compete provision
by establishing a competing business and soliciting Seed's investor
and future customer ............................................................................... 13

    B.  Breach of the 2018 Agreement ............................................................................ 15

        1.  The 2018 Agreement is a valid contract .............................................. 15

        2.  Andersson breached the 2018 Agreement because he solicited Seed's
customers .............................................................................................. 15

        3.  Andersson also breached the 2018 Agreement when he downloaded
Seed's confidential information, and then used it as part of his
presentation ........................................................................................... 16

    C.  Andersson violated ITSA by misappropriating Seed's trade secrets in support
of his own new business venture .......................................................................... 18

        1.  Andersson obtained Seed CX's trade secrets and learned of Seed
CX's trade secrets during his time as a consultant ................................. 19

        2.  Andersson's downloading and use of Seed's trade secrets in his own
business and to solicit Seed's funder is misappropriation ...................... 20

D.    Andersson violated DTSA by misappropriating Seed's trade secrets in support of his own new business venture.................................................................22

II.    Seed will be irreparably harmed absent a TRO, and there is no adequate remedy at law that will compensate it for Andersson's actions ...................................................24

A.    The parties' agreements contemplate that breaches of the confidentiality provision will result in irreparable harm entitling Seed CX to an injunction .............24

B.    Damages from the breach of the confidentiality provision, the non-competition provision, or the misappropriation of Seed's trade secrets will not adequately compensate Seed........................................................................25

III.    Remaining factors favor injunctive relief........................................................27

IV.    Relief .................................................................................................................27

# TABLE OF AUTHORITIES

## Cases

*Agilent Techs., Inc. v. Kirkland*,
   No. C.A. No. 3512-VCS, 2010 WL 610725 (Del. Ch. Feb. 18, 2010)............................. 11, 17, 18, 26

*Delaware Exp. Shuttle, Inc. v. Older*,
   No. Civ. A. 19596, 2002 WL 31458243 (Del. Ch. Oct. 23, 2002) ......................................14

*Delta Med. Sys. v. Mid–Am. Med. Sys., Inc.*,
   331 Ill.App.3d 777, 265 Ill. Dec. 397, 772 N.E.2d 768 (Ill.App.Ct. 1st Dist. 2002) .......19

*Gateway Eastern Ry. Co. v. Terminal R.R. *1043 Ass'n of St. Louis*,
   35 F.3d 1134 (7th Cir. 1994)............................................................................................24

*Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S.A.*,
   549 F.3d 1079 (7th Cir. 2008).........................................................................................11

*Hexacomb Corp. v. GTW Enters., Inc.*,
   875 F. Supp. 457 (N.D. Ill. 1993).....................................................................................26

*Hough Assocs., Inc. v. Hill*,
   No. Civ.A. 2385-N, 2007 WL 148751 (Del. Ch. Jan. 17, 2007) .................................. 13, 25

*Lambert v. Buss*,
   498 F.3d 446 (7th Cir. 2007)............................................................................................11

*Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*,
   342 F.3d 714 (7th Cir. 2003)............................................................................................19

*LKQ Corp. v. Fengler*,
   No. 12-CV-2741, 2012 WL 1405774 (N.D. Ill. Apr. 23, 2012) .................................... 18, 19

*Luden's Inc. v. Local Union No. 6 of Bakery, Confectionery & Tobacco Workers' Int'l Union of Am.*,
   28 F.3d 347 (3d Cir. 1994) ..............................................................................................12

*Meridian Mut. Ins. Co. v. Meridian Ins. Group, Inc.*,
   128 F.3d 1111 (7th Cir. 1997)..........................................................................................24

*Mission Measurement Corp. v. Blackbaud, Inc.*,
   216 F. Supp. 3d 915 (N.D. Ill. 2016) ................................................................................23

*Molon Motor & Coil Corp. v. Nidec Motor Corp.*,
   No. 16 C 03545, 2017 WL 1954531 (N.D. Ill. May 11, 2017)................................... 23, 24

*O'Leary v. Telecom Res. Serv., LLC*,
   Civil Action No. 10C-03-108-JOH, 2011 WL 379300 (Del. Super. Ct. Jan. 14, 2011)....................13

*Optionmonster Holdings, Inc. v. Tavant Techs., Inc.,*
    No. 10 C 2792, 2010 WL 2639809 (N.D. Ill. June 29, 2010) .................................................25, 26, 27

*Research & Trading Corp. v. Pfuhl,*
    No. Civ. A. No. 12527, 1992 WL 345465 (Del. Ch. Nov. 18, 1992)........................................... 13, 14

*RHIS, Inc. v. Boyce,*
    No. Civ.A. 18924, 2001 WL 1192203 (Del. Ch. Sept. 26, 2001).......................................................14

*RKI, Inc. v. Grimes,*
    177 F. Supp. 2d 859 (N.D. Ill. 2001) .................................................................................... 21, 22

*Roland Machinery Co. v. Dresser Indus., Inc.,*
    749 F.2d 380 (7th Cir. 1984)..........................................................................................................24

*Signal Fin. Holdings, LLC v. Looking Glass Fin. LLC,*
    Case No. 17 C 8816, 2018 WL 636769 (N.D. Ill. Jan. 31, 2018) ...........................................22, 25, 27

*Simplexity, LLC v. Zeinfeld,*
    No. Civil Action No. 8171-VCG, 2013 WL 1457726 (Del. Ch. Apr. 5, 2013).................................14

*Somerset Place, LLC v. Sebelius,*
    684 F. Supp. 2d 1037 (N.D. Ill. 2010).............................................................................................24

*Stahler v. Antenna Sys., Inc.,*
    No. 12 CV 1909, 2015 WL 2455120 (N.D. Ill. May 22, 2015)...........................................................11

*Stampede Tool Warehouse, Inc. v. May,*
    272 Ill.App.3d 580, 651 N.E.2d 209 (1995), *as modified* (June 14, 1995)........................................21

*Strata Marketing, Inc. v. Murphy,*
    317 Ill.App.3d 1054, 251 Ill.Dec. 595, 740 N.E.2d 1166 (Ill.App.Ct. 1st Dist. 2000) .....................19

*Televation Telecomm. Sys., Inc. v. Saindon et al.,*
    169 Ill.App.3d 8, 119 Ill.Dec. 500, 522 N.E.2d 1359 (2nd Dist. 1988)..............................................19

*Turnell v. CentiMark Corp.,*
    796 F.3d 656 (7th Cir. 2015)..........................................................................................................11

*Ty, Inc. v. Jones Grp., Inc.,*
    237 F.3d 891 (7th Cir. 2001).........................................................................................................26

*Vitalink Pharmacy Servs., Inc. v. Grancare, Inc.,*
    No. 15744, 1997 WL 458494 (Del. Ch. Aug. 7, 1997)........................................................................25

*Weichert Co. of Pa. v. Young,*
    No. C.A. No. 2223-VCL, 2007 WL 4372823 (Del. Ch. Dec. 7, 2007)..............................................16

**Statutes**

18 U.S.C. § 1836...............................................................................................................22, 26

18 U.S.C. § 1839...................................................................................................................23

765 Ill. Comp. Stat. Ann. 1065..................................................................................19, 20, 21, 26

**Other Authorities**

2 Williston on Contracts § 6:43 (4th ed.)..................................................................................12

Defendant Russell Andersson was a consultant for Plaintiff Seed CX Ltd. ("Seed CX") for three years. Seed CX, together with its wholly owned subsidiaries, runs a financial trading platform for institutional investors to trade and exchange digital assets (like Bitcoin). Prior to consulting for Seed CX, Andersson had no experience with digital assets. In the past ten days, however, Andersson pitched a competing venture to Seed CX's flagship investor and customer after downloading confidential information from Seed CX's servers and soliciting more confidential information from Seed CX employees. These actions violate non-compete and confidentiality provisions in the parties' consulting agreements and are a misappropriation of Seed CX's trade secrets under Illinois and federal law.

Seed CX asks the Court to enjoin Andersson's use of its trade secrets, enjoin Andersson's solicitation of its customers until August 2019, and provide specific performance under the non-compete provision until April 2019. Seed CX also asks the Court to order Andersson to destroy any Seed CX confidential information that he has in his possession. This motion is supported by the attached declaration from Seed CX's CEO, Edward Woodford, the accompanying exhibits, and the arguments below.

## FACTUAL BACKGROUND

### I.    Seed CX is a digital-asset exchange that its founders built from scratch

Seed CX is a startup company in Chicago developing an exchange for digital assets. A digital asset is a new form of financial technology. The most well-known digital asset is the crypto-currency Bitcoin. Seed CX, and its subsidiaries (collectively, "Seed"), matches buyers and sellers who want to exchange a digital asset and then settles and administers the trade. Woodford Decl. ¶ 3.

For example, one investor may want to buy a single Bitcoin for $5,000, and another investor may want to sell a single Bitcoin for that price. The exchange matches the buyer to the seller, which results in the execution of a trade. In addition, Seed will also allow buyers to purchase digital assets

2

on margin. If a seller is offering one Bitcoin for $5,000, a buyer can enter an order and execute a trade to purchase that Bitcoin with less than the full $5,000 in their account (e.g., if $2,500 is in the buyer's account, this would represent a 50% margin trade), although the buyer would still need to deliver the full $5,000 to complete the settlement of the transaction. Woodford Decl. ¶ 4.

These transactions are made more complicated by the unique features of digital assets. One of the features of digital assets is the existence and use of a unique "private key" associated with each asset, which is used to secure said asset. These private keys are used to verify transactions and to enable secure movements between buyers and sellers. A digital exchange typically has to "hold" digital assets for customers in order to allow efficient trading and settlement of such digital assets. Another feature is the publicly available ledger that maintains all movements. Every transaction that results in a ledger update is mathematically verified. Building systems and working with vendors to store digital assets, interacting with the blockchain and updating that ledger to reflect executed transactions are unique technical challenges that Seed has had to overcome. Compounding the complexity of Seed's business model is its customer base. Seed's exchange serves institutional investors, who engage in larger, more complex transactions. Woodford Decl. ¶ 7. The company has had to figure out how to make these more complex transactions possible in the first place, as well as secure. Woodford Decl. ¶ 7.

Seed has resolved these and other issues associated with a trading venue for digital assets consistent with the federal and state regulatory structures governing financial exchanges. Woodford Decl. ¶ 9. Crypto or digital assets are an emerging technology, and the company has invested heavily to integrate this technology into a more established regulatory ecosystem. For example, Seed has a Swap Execution Facility that is regulated by the Commodity Futures Trading Commission (CFTC) and its equivalent with European regulators. Seed is also preparing a registration with FINRA as a broker-dealer. Other aspects of the business are regulated by the U.S. Treasury Department, state

regulators, and the National Futures Association. Woodford Decl. ¶ 9. Seed has invested heavily in structuring its business to ensure ongoing compliance, which differentiates the company from others in the sector. Woodford Decl. ¶ 9.

Two types of relationships are essential to Seed's ability to function. The first is Seed's relationship with its investors. Woodford Decl. ¶ 10-11. The goodwill the company has developed with its investors is essential to its future operations. Most, if not all, of Seed's investors are, or will be, institutional customers on the exchange. In addition, Seed relies on its investors to continue investing to develop its exchange. Seed has obtained several rounds of funding from investors and expects to seek more from the same groups. If an investor decides not to maintain its investment, this would pose serious problems for Seed. Not only would there be the loss of new funds and technical contributions from investors, and the potential growth that would come along with that investment. But an investor choosing not to re-invest is often seen as a negative signal to other would-be investors. As a result, Seed is discreet with the identity of its funders until the funding is secured. *Id.*

The second essential relationship is with banks. Woodford Decl. ¶ 12. Seed needs access to fiat assets (such as the U.S. Dollar) in order to run its exchange. Seed has developed robust relationships with banks to hold those fiat assets. Woodford Decl. ¶ 12. Banks do not normally disclose their customer lists or their involvement with digital assets. Seed spent time and social capital to develop these relationships, and they are necessary for the exchange's future. Woodford Decl. ¶ 12.

## II.    Andersson is a consultant that Seed hired to help develop its business

As a startup, Seed relies on consultants. They provide relevant industry experience and are generally cheaper than hiring a full-time employee. For a consultant to provide the best advice, Seed has to give the consultants access to its confidential information. But Seed's most valuable asset is

the confidential information reflected in how the company operates its business. And the company does not want to get a consultant's advice at the cost of training or enabling future competitors. Woodford Decl. ¶ 13.

To avoid this situation, Seed secures its confidential information and relies on non-compete and confidentiality agreements with its consultants. Seed also secures its confidential information in several ways. It requires two-factor authentication to access its data and programs, maintains a record of every time a person views a particular document, conducts ongoing cyber tests, and uses non-disclosure agreements and confidentiality provisions, among other things. In addition to these restrictions, Seed requires confidentiality provisions and non-compete provisions with its consultants. Woodford Decl. ¶ 14.

Russell Andersson began working as a consultant for Seed in 2015. Woodford Decl. ¶ 15. Prior to working at the company, Andersson did not have any experience with digital assets, although he did have experience with exchanges generally. Woodford Decl. ¶ 15. In his capacity as a consultant, Andersson worked in several areas of the business, including strategic planning, helping launch the company, and understanding and improving the company's operation, among other things. For him to provide these services, Andersson had access to Seed's confidential information and trade secrets. He had wide access to Seed's data storage systems and had administrative rights to the customer relationship management system, which includes contacts and other information on the company's customers. Woodford Decl. ¶ 16.

The parties had two agreements that Andersson breached, discussed in greater depth below. The first consulting agreement began in 2015 and had both a confidentiality and non-compete provision. Ex. 1. Andersson ended the relationship briefly in April 2018, and the parties entered into a second agreement a few months later, in June 2018. Woodford Decl. ¶ 15, Ex. 2. In addition, the

parties had a non-disclosure agreement covering all of Andersson's work from August 24, 2015. Woodford Decl. ¶ 15, Ex. 3.

### III. Andersson downloaded Seed's trade secrets and used the confidential information he learned as part of the consulting relationship to pitch his own digital-asset exchange to Seed's flagship investor and customer

In August 2018, Andersson used Seed's confidential information to begin his own competing business. On August 11, 2018, on information and belief, Andersson first registered the domain name ChicagoDigitalAssetExchange.com. Woodford Decl. ¶ 19. On August 16, 2018, Andersson downloaded Seed's financial data and models relating to how the exchange operates. Woodford Decl. ¶ 26. Prior to this download, Andersson did not have any involvement with Seed's modeling. Woodford Decl. ¶ 26.b.



Ex. 11, Screenshot of Network Activity.

On Friday, August 24, one of Seed's board members learned that Andersson had emailed the company's flagship investor and future customer, seeking funding for a new business that was very similar to Seed's exchange. Woodford Decl. ¶ 17. Andersson learned the identity of Seed's investor and future customer through his work at Seed and his access rights to Seed's confidential

information. Woodford Decl. ¶ 18. He had met with the same investor at Seed's offices on August 6, 2018. Woodford Decl. ¶ 18.

In the email, Andersson described a digital asset exchange that shares the essential features of Seed's exchange:

> While there is a lot of noise / activity in the space, nobody seems to be making any meaningful regulatory progress and many of these competitive teams are facing fundamental blockers around clearing [transactions] mainly. . . .I have solutions to the clearing issue, the shorting issue, the margin issue, and other challenges and have developed a vastly superior exchange / clearing model. It's quick, inexpensive to build, fast to regulate, easy to access, compresses liquidity, etc and provides numerous other customer benefits that i will profile for you. Its vastly superior to anything that I have seen announced or unannounced . . . this model could own the crypto derivatives space, and has unicorn potential. Ideally we are looking for a [Silicon Valley] venture group to match a capital markets investor, ideally from the prime brokerage space, so wanted to get the ball rolling. . . . I'm expecting you will be impressed, and at the very least you will learn a lot about exchanges that may help you in evaluating other parts of your portfolio and overseeing Seed [CX].

Ex. 4, 8/21/2018 Andersson Email to Investor; Woodford Decl. ¶ 21.

Soon after sending this email to Seed's investor, Andersson made two overtures to Seed employees seeking additional information about the company's operations. An hour after sending this email, he sent a message through Seed's collaboration tool Slack asking for a financial model that the company had developed. Woodford Decl. ¶ 26.b. Prior to this, Andersson had minimal, if any, involvement in the company's modeling. Three hours after sending the email to Seed's investor, Andersson asked another Seed employee for a copy of a "comscape" or a landscape regarding the company's competitors that the company had developed. Woodford Decl. ¶ 25.b.

Shortly after learning about Andersson's proposed business and pitch to Seed's investor, Seed's CEO, Edward Woodford approached Andersson. Woodford Decl. ¶ 22. Two days later, Mr. Woodford arranged to see the presentation over the internet. Mr. Woodford and his co-founder took screenshots or pictures of the slides. Woodford Decl. ¶ 22, Ex. 5.

The presentation shows that Andersson's new exchange would directly compete with Seed and relied on Seed's confidential information, including the information downloaded on August 16. Andersson had no relevant experience in digital-asset exchanges prior to working with Seed, but his presentation describes a digital-asset exchange for institutional investors.

In describing his new business, Andersson touts his ability to solve several issues with respect to a digital-asset exchange that he had learned while working for Seed based on Seed's confidential information. Woodford Decl. ¶ 23-26. The presentation provides a scorecard reflecting Seed's competitive landscape. Andersson provides information on staffing and budgeting that uses projected numbers nearly identical to Seed's and reflects Seed's own approach. Seed invested a great deal to arrive at these numbers and ensure that its staffing model is consistent with relevant regulations and business needs. Woodford Decl. ¶ 25.c.

One slide in Andersson's presentation in particular touts the various types of "secret sauce" that are necessary to run an institutional digital-asset exchange. As his characterization indicates, this information is competitively sensitive and essential to the exchange's operation. Woodford Decl. ¶ 26. Andersson learned this information directly through his work at Seed. Woodford Decl. ¶ 26. In particular:



- "Direct Access to the widest customer base (Min Deposit $250k)" refers to the company's targeting of institutional investors, like the flagship Seed investor that Andersson had contacted. Woodford Decl. ¶ 25.a.

- "Real time risk management" refers to how an exchange permits trades on margin, which Andersson calls "secret sauce" in the slide above. "Smart Clearing and Margin" is, in Andersson's words, "Lots more secret sauce!" This refers to a specific model Seed built for margin trading on the exchange. Seed has invested heavily in building these models, including aggregating, coding, and testing market data. This is the same model that Andersson requested from a Seed employee days before, on August 24, and that he downloaded from Seed's servers on August 16. Andersson was not otherwise involved with Seed's modeling. Woodford Decl. ¶ 26.a-b.

- "Smart Ledgering" refers to how Seed has optimized its digital ledger for institutional investors. Andersson calls this "more secret sauce," which reflects the information's competitive value and Seed's own efforts to keep the information

confidential. Andersson did not have experience with smart ledgering prior to working at Seed and did not work with Seed's models as a consultant. Woodford Decl. ¶ 26.c.

- "Expansive Fiat Based Omnibus Relationships ('bankchaining')" refers to a digital-asset exchange's relationship with banks. As discussed above, a bank's relationship with a digital-asset exchange is not generally known. And Andersson only had knowledge of banks willing to invest in crypto exchanges through his time at Seed. Woodford Decl. ¶ 26.e.

Elsewhere, Andersson describes how his new venture will have offerings that Seed is developing. He describes "Default management" and "Default derivatives for a guarantee fund" as "New Model Solutions" that his venture would provide and that were "Patentable." Woodford Decl. ¶ 26.d. These terms both refer to offerings that Seed is currently developing. Andersson only learned about these offerings through a July 5, 2018 email and document from Seed's CEO. Woodford Decl. ¶ 26.d.

Both of Seed's co-founders expressed their concerns about the presentation to Andersson. Woodford Decl. ¶ 28. But on Monday, August 27, Andersson gave the presentation to Seed's flagship investor. On information and belief, Andersson met with his own intellectual-property attorneys on August 30 to discuss the patenting of processes bearing on Seed's work. This lawsuit followed.

**ARGUMENT**

Seed asks the Court to issue a temporary restraining order enjoining Andersson from violating the terms of his 2015 and 2018 Consulting Agreements with Seed, and to stop misusing Seed's trade secrets in violation of the Defend Trade Secrets Act and the Illinois Trade Secrets Act.

To obtain a TRO or preliminary injunction, "the moving party must demonstrate (1) a likelihood of success on the merits; (2) a lack of an adequate remedy at law; and (3) an irreparable harm will result if the injunction is not granted." *Lambert v. Buss*, 498 F.3d 446, 451 (7th Cir. 2007) (citations omitted).[1] If the moving party meets these requirements, then the court balances the relative harms that could be caused to either party. *Id.* "The court weighs the balance of potential harms on a 'sliding scale' against the movant's likelihood of success: the more likely he is to win, the less the balance of harms must weigh in his favor; the less likely he is to win, the more it must weigh in his favor." *Turnell v. CentiMark Corp.*, 796 F.3d 656, 662 (7th Cir. 2015). All of these elements are satisfied here.

## I.     Seed has a substantial likelihood of success on the merits

A plaintiff can show a likelihood of success on the merits by demonstrating "that it has a 'better than negligible' chance of success on the merits of at least one of its claims." *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S.A.*, 549 F.3d 1079, 1096 (7th Cir. 2008).

### A.     Breach of the 2015 Agreement

In a breach of contract case, a plaintiff must show an existence of a contract, the breach of a contractual obligation, and damage as a result. *Agilent Techs., Inc. v. Kirkland*, No. C.A. No. 3512-VCS, 2010 WL 610725, at *14 (Del. Ch. Feb. 18, 2010).[2] Seed alleges one violation of the parties' 2015 Consulting Agreement and two violations of the 2018 Consulting Agreement.

#### 1.     The 2015 Agreement is a valid contract that Andersson terminated in April 2018

The parties entered into a Consulting Agreement on September 1, 2015 ("2015 Agreement"). Ex. 1, 2015 Agreement. The 2015 Agreement set forth the responsibilities and terms

---

[1] The standard for a TRO and a preliminary injunction is identical. *Stabler v. Antenna Sys., Inc.*, No. 12 CV 1909, 2015 WL 2455120, at *4 (N.D. Ill. May 22, 2015).

[2] The contracts at issue are governed by Delaware law. Ex. 1 (2015 Contract) at ¶13; Ex. 2 (2018 Contract) at ¶14.

of Andersson's relationship with Seed. In addition to other services, Andersson would be providing "ad hoc consulting and advice as requested from time to time by the Company." Ex. 1, 2015 Agreement, Ex. A. The 2015 Agreement has both a non-compete and a confidentiality clause. *Id.* at 1, 3. In exchange for this ad hoc consulting and advice, Seed paid Andersson a set amount every month for the first three months. Thereafter, Seed paid Andersson a set amount for any month in which he provided ad hoc consulting services.

Although the 2015 Agreement states that it was for two months, the agreement governed the terms of the parties' relationship until Andersson terminated it in April 2018. "When a contract of employment for a definite time has been made, and the employee's services are continued after the expiration of the definite time without objection, the inference is ordinarily that the parties have assented to another contract for a term of the same length with the same salary and conditions of service . . . ." 2 Williston on Contracts § 6:43 (4th ed.); *Luden's Inc. v. Local Union No. 6 of Bakery, Confectionery & Tobacco Workers' Int'l Union of Am.*, 28 F.3d 347, 355–56 (3d Cir. 1994). Here, the 2015 Agreement was nominally only for a two-month duration, but the parties carried out the terms of the agreement for three years for any month in which Andersson provided consulting services. Woodford Decl. ¶ 15. Indeed, the parties' 2018 Agreement recognizes in its recitals that "the Consultant and Company executed [an agreement] dated 1st September 2015. Consultant has been working with company on an ad hoc basis since 1st September 2015. Consultant terminated services on 1 April 2018 for a short period, but was re-engaged." Ex. 2, 2018 Agreement at 1.

### 2. The 2015 Agreement has a non-compete provision

The non-compete clause prevents Andersson from competing for a year after termination of the Agreement:

> In order to protect the Company's Confidential Information and goodwill during the term of this Agreement and for a period of twelve (12) months thereafter ("the Restricted Period"), Consultant will not, directly or indirectly, otherwise[] engage, participate or invest

> in any business activity, in a competitive capacity, anywhere that the
> Company conducts business or proposes to conduct business, to the
> extent such business activity is competitive with the products or
> services of the Company or products or services that the Company
> has under development or that are the subject of active planning;

Ex. 1 at 3. Given Andersson's April 1, 2018 termination of the parties' relationship, the non-compete expires in April 2019.

### 3. Andersson breached the 2015 Agreement's non-compete provision by establishing a competing business and soliciting Seed's investor and future customer

To establish a reasonable probability of success on the merits of a claim to enforce a non-compete, Seed must show that the non-compete agreement is enforceable, that Andersson breached it, and that Seed suffered damages as a result. *See Hough Assocs., Inc. v. Hill*, No. Civ.A. 2385-N, 2007 WL 148751, at *14 (Del. Ch. Jan. 17, 2007). To be enforceable, "a covenant not to compete must be reasonable in geographic scope and temporal duration, must advance a legitimate economic interest of the party seeking its enforcement, and must survive a balancing of the equities in order to be enforceable." *Id.*

The 2015 Agreement's non-compete provision is reasonable. First, it is limited in time to one year from the agreement's termination, which Delaware courts have found to be reasonable in similar circumstances. *Research & Trading Corp. v. Pfuhl*, No. Civ. A. No. 12527, 1992 WL 345465, at *11 (Del. Ch. Nov. 18, 1992) ("The non-competition agreement is only of one year duration. This is plainly reasonable in the circumstances.").

Second, the geographic limitation is reasonable given the nature of the business. Delaware courts "are not adverse to broad geographical scopes when they are necessary to protect the legitimate business interests of the party trying to enforce the covenant." *O'Leary v. Telecom Res. Serv., LLC*, Civil Action No. 10C-03-108-JOH, 2011 WL 379300, at *5 (Del. Super. Ct. Jan. 14, 2011). The reasonableness of a geographic limitation must take into account "the reality . . . that it is the

13

employer's goodwill in a particular market which is entitled to protection." *Research & Trading Corp.*, 1992 WL 345465, at *12. And if an otherwise enforceable non-compete provision is too broad, the Court has the power to reform or "blue pencil" its scope. *RHIS, Inc. v. Boyce*, No. Civ.A. 18924, 2001 WL 1192203, at *7 (Del. Ch. Sept. 26, 2001); *Delaware Exp. Shuttle, Inc. v. Older*, No. Civ. A. 19596, 2002 WL 31458243, at *14 (Del. Ch. Oct. 23, 2002).

Seed competes in the U.S. and European markets for digital-asset exchanges, and a prohibition against Andersson operating a competing company in these markets is necessary to protect Seed's goodwill in these markets. By definition, digital assets transcend national boundaries. Unlike fiat currencies, digital assets are not tied to a specific country or government. Indeed, several of Seed's customers and investors are international or trans-national institutions. A prohibition that applies anywhere that Seed competes protects Seed's goodwill in these markets. *See Simplexity, LLC v. Zeinfeld*, No. Civil Action No. 8171-VCG, 2013 WL 1457726, at *10 (Del. Ch. Apr. 5, 2013) ("As noted above, the agreement limits only employment in which Zeinfeld himself engages in activity competitive with the company-he is not strictly prohibited from working for a competitor, only from engaging in competitive activity.") (applying Virginia law).

Third, the non-compete provision advances Seed's legitimate economic interests. Seed has expended substantial amounts of time, money, and labor to build a novel digital-asset exchange. Developing that exchange required Seed to navigate complex regulatory waters, develop technology that would serve institutional investors and accommodate a new and untested asset class, and understand how to structure the business to be profitable. Woodford Decl. ¶ 7-9. Seed also developed and maintained relationships with its investors and banks, and its continued success depends on maintaining its goodwill with these companies. Woodford Decl. ¶ 10-12. Andersson had access to Seed's technology and innovations as well as Seed's relationships with its funders and

14

banking partners. Woodford Decl. ¶ 16, 18. He used these trade secrets and goodwill to set up his own company and violated the 2015 Agreement.

### B. Breach of the 2018 Agreement

#### 1. The 2018 Agreement is a valid contract

In April 2018, Andersson terminated his relationship with Seed. Ex. 2, 2018 Agreement at 1. But two months later, the parties entered into an Amended and Restate [sic] Consulting Agreement ("2018 Agreement"), which required Andersson to perform various services to support Seed's ongoing development. 2018 Agreement at Schedule A. In exchange, Seed paid Andersson a lump sum for two months and an hourly rate thereafter. *Id.*

#### 2. Andersson breached the 2018 Agreement because he solicited Seed's customers

The 2018 Agreement has a non-solicitation provision, which Andersson breached when he approached Seed's investor and customer to tout his competing business. The non-solicitation provision prohibits soliciting Seed's customers and seeking to divert Seed's business:

> In order to protect the Company's Confidential Information and good will, during the term of this Agreement and for a period of twelve (12) months thereafter (the "Restricted Period") [sic] During the Restricted Period, Consultant will not, directly or indirectly, in any manner, other than for the benefit of the Company, (a) call upon, solicit, divert or take away any of the customers, business or prospective customers of the Company or any of its suppliers, and/or (b) solicit, entice or attempt to persuade any other employee or consultant of the Company to leave the services of the Company for any reason.

*Id.* at 3.

As with non-compete provisions, non-solicitation provisions must be reasonable in geography and duration, protect Seed's economic interests, and be equitable. A company "has an interest in the goodwill created by its sales representatives and other employees, which is vulnerable to misappropriation if the employer's former [consultants] are allowed to solicit its customers shortly

after changing jobs." *Weichert Co. of Pa. v. Young*, No. C.A. No. 2223-VCL, 2007 WL 4372823, at *4 (Del. Ch. Dec. 7, 2007).

Andersson damaged Seed's goodwill with its funder and customer when he solicited business for his new venture. The institutional funders supporting Seed are creating a platform in which they can manage their own digital assets as Seed's customers. Woodford Decl. ¶ 11. Thus, rather than passive investors, the investors are building an exchange for their own use. Andersson knows this from his time with Seed, yet he approached Seed's investor intending to develop his own competing exchange. His overtures undermine Seed's goodwill with its investor and future customer, and they may undermine the investor's confidence in Seed as part of their ongoing relationship. Woodford Decl. ¶ 25.a.

Finally, the non-solicitation provision is reasonable in geography and scope. The non-solicitation provision is limited to one year from Seed's August 26, 2018 termination of the 2018 Agreement. *See e.g.*, *Weichert Co.*, 2007 WL 4372823, at *3 ("Covenants of two-years' duration are consistently held to be reasonable."). And the prohibition is limited to Seed's customers, business, and prospective customers. Following the end of the non-compete in the 2015 Agreement, Andersson is free to work for a competing company, including starting his own (provided that he does not use Seed confidential information). Such a restriction is reasonable. And for the reasons discussed, that prohibition protects Seed's economic interests and is equitable.

        **3.**     **Andersson also breached the 2018 Agreement when he downloaded Seed's confidential information, and then used it as part of his presentation**

Andersson also breached the confidentiality provisions of the 2018 Agreement. The 2018 Agreement restricted Andersson's ability to use Seed's confidential information. Ex. 2 at 1. The 2018 Agreement broadly defines Confidential Information as follows:

> "Confidential Information" means all information, whether or not in writing, concerning the Company's business, technology, business

16

> relationships or financial affairs which the Company has not released
> to the general public.  By way of illustration, Confidential
> Information may include information or material which has not been
> made generally available to the public, such as:  (a) *corporate information*,
> including plans, strategies, methods, policies, resolutions, negotiations
> or litigation; (b) *marketing information*, including strategies, methods,
> customer identities or other information about customers, prospect
> identities or other information about prospects, or market analyses or
> projections; (c) *financial information*, including cost and performance
> data, debt arrangements, equity structure, investors and holdings,
> purchasing and sales data and price lists; and (d) *operational and
> technological information*, including plans, specifications, manuals, forms,
> templates, software, designs, methods, procedures, formulas,
> discoveries, inventions, improvements, concepts and ideas; and (e)
> *personnel information*, including personnel lists, reporting or
> organizational structure, resumes, personnel data, compensation
> structure, performance evaluations and termination arrangements or
> documents.  Confidential Information also includes information
> received in confidence by the Company from its customers or
> suppliers or other third parties. *Id.*

The 2018 Agreement then prohibits Andersson from using Confidential Information for any

purpose other than working on Seed's behalf. *Id.*

> Consultant will not, at any time, without the Company's prior written
> permission, either during or after the term of this Agreement,
> disclose any Confidential Information to anyone outside of the
> Company, or use or permit to be used any Confidential Information
> for any purpose other than the performance of the Services for or on
> behalf of the Company.

*Id.*

Confidentiality provisions are enforceable like any other contractual provision if the plaintiff

can show a valid contract, breach, and damages. *See, e.g.*, *Agilent Techs.*, 2010 WL 610725, at *14.

Andersson agreed to the provisions in the 2018 Agreement in exchange for payment and it is thus a

valid contract.

Andersson breached the agreement by misappropriating and then using Seed's confidential

information. In the days leading up to approaching Seed's investor, Andersson downloaded several

proprietary documents from Seed's servers. Woodford Decl. ¶ 26.b. These documents included Seed

financial forecasts and financial modeling. Woodford Decl. ¶ 26.b. Hours after Andersson approached Seed's investor and customer to pitch his new business, Andersson solicited a Seed employee asking for the company's assessment of the competitive landscape. Woodford Decl. ¶ 25.b. And he asked another Seed employee for additional financial models the company has developed to assess risk. Woodford Decl. ¶ 26.b. Andersson then used Seed's confidential information to pitch his own competing business to Seed's investor. Woodford Decl. ¶ 26.b.

Andersson had no experience with digital assets prior to working at Seed, and he lacks the technical know-how to build a digital-asset exchange without relying on the work that he performed or had access to at Seed. Woodford Decl. ¶ 25-27. To the extent that Andersson claimed to Seed's customer that he has access to the "secret sauce" needed to create a digital-asset exchange, he only had it because he has taken or learned that information from Seed. Woodford Decl. ¶ 26. His downloading of Seed confidential information, incorporation of that information into a presentation, and his reliance on the data he downloaded or learned from Seed to tout his own venture, is a forbidden "use" of that information under the 2018 Agreement. *See Agilent Techs.*, 2010 WL 610725, at *14 ("But the inescapable reality is that the individual defendants are each sophisticated people who signed clear contracts. It would be one thing if they were being sued because they happened to keep an Agilent document inadvertently. That is not the situation. Kirkland, Langlois, and DeStefano took a great deal of confidential information in clear breach of their contractual duties, and then used that information to compete with Agilent.").

### C. Andersson violated ITSA by misappropriating Seed's trade secrets in support of his own new business venture

In addition to breaching his contracts with Seed, Andersson also violated the Illinois Trade Secrets Act (ITSA). To prevail on a claim under ITSA, Seed must establish that the information at issue was (1) a trade secret, (2) that Defendants misappropriated the information, and (3) that it was used in Defendants' business. *LKQ Corp. v. Fengler,* No. 12-CV-2741, 2012 WL 1405774, at *6 (N.D.

18

Ill. Apr. 23, 2012) (citing *Strata Marketing, Inc. v. Murphy,* 317 Ill.App.3d 1054, 251 Ill.Dec. 595, 740

N.E.2d 1166, 1176 (Ill.App.Ct. 1st Dist. 2000).

1.     **Andersson obtained Seed CX's trade secrets and learned of Seed CX's trade secrets during his time as a consultant**

ITSA defines a trade secret as:

> [I]nformation, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that: (1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

765 Ill. Comp. Stat. Ann. 1065/2(d). *See also LKQ Corp.,* 2012 WL 1405774, at *6 (citing *Delta Med.*

*Sys. v. Mid–Am. Med. Sys., Inc.,* 331 Ill.App.3d 777, 265 Ill. Dec. 397, 772 N.E.2d 768, 780 (Ill.App.Ct.

1st Dist. 2002); *see also Learning Curve Toys, Inc. v. PlayWood Toys, Inc.,* 342 F.3d 714, 723 (7th Cir.

2003).); *Televation Telecomm. Sys., Inc. v. Saindon et al.,* 169 Ill.App.3d 8, 119 Ill.Dec. 500, 522 N.E.2d

1359 (2nd Dist. 1988) ("[a]n employer has a recognized business interest in protecting trade secrets

disclosed in confidence to the employee during the course of his employment . . . even where . . .

there is no enforceable restrictive covenant between the parties.").

As discussed above, Andersson downloaded several files from Seed's servers before his pitch

to Seed's investor and customers. These files included Seed's financial forecasts and models that

Seed used to structure its exchange. He also solicited Seed employees for competitive information

and additional Seed models. This information is not generally known, and Seed's competitors could

gain economic value from its disclosure.  Woodford Decl. ¶ 25, 26.

As a consultant, Andersson also had access to confidential information regarding how Seed

structured its exchanges. He had administrative rights to Seed's list of funders, customers, and

banking partners. Woodford Decl. ¶ 16.  He was privy to the company's finances, its approach to

obtaining regulatory approval for its exchanges, and its approach to profitability within a highly regulated environment. Woodford Decl. ¶ 16. And he had access to the company's technical approach to running an exchange that trades highly technical and specific digital assets for institutional investors. Woodford Decl. ¶ 16. Seed takes reasonable measures to maintain the secrecy of this information by imposing restrictions on who can access the information, requiring two-factor authentication, and auditing the sufficiency of its protections. Woodford Decl. ¶ 14.

### 2. Andersson's downloading and use of Seed's trade secrets in his own business and to solicit Seed's funder is misappropriation

ITSA defines misappropriation in three ways relevant here.

"Misappropriation" means:

(1) acquisition of a trade secret of a person by another person who knows or has reason to know that the trade secret was acquired by improper means; or

(2) disclosure or use of a trade secret of a person without express or implied consent by another person who:

(A) used improper means to acquire knowledge of the trade secret; or

(B) at the time of disclosure or use, knew or had reason to know that knowledge of the trade secret was:

* * *

(II) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use . . . .

765 Ill. Comp. Stat. Ann. 1065/2 (b). The statute defines "improper means" to include a "breach or inducement of a breach of a confidential relationship or other duty to maintain secrecy or limit use". *Id.* at 1065/2(a).

Andersson misappropriated Seed's trade secrets when he downloaded confidential information for his own competing business venture. Even though he had access to the information as part of his job, Andersson's downloading of that information for his own business is

"acqui[ring] of a trade secret of another" under ITSA. In addition, Andersson knew or had reason to know that "the trade secret was acquired by improper means," because he downloaded it for his own purposes in violation of his Confidentiality Agreement and his duty of secrecy. 765 Ill. Comp. Stat. Ann. 1065/2. *See RKI, Inc. v. Grimes*, 177 F. Supp. 2d 859, 875 (N.D. Ill. 2001) ("Grimes used 'improper means' in misappropriating Roll–Kraft's trade secrets. While employed by Roll–Kraft, Grimes downloaded, copied or otherwise transmitted the ACT, BAM and NPI data for purposes other than serving the interests of Roll–Kraft. The Court reaches this conclusion based on direct and strong circumstantial evidence.").

Andersson also misappropriated Seed's trade secrets when he used knowledge of Seed's funders to make a pitch for his own business. A "list of actual or potential customers or suppliers" is a trade secret. 765 Ill. Comp. Stat. Ann. 1065/2(d). He "used" these trade secrets "without [Seed's] express or implied consent." *Id.* at 1065/2(b). And Andersson knew that he had acquired the identity of Seed's customers and funders as part of his consulting relationship (covered by both confidentiality provisions and a non-disclosure agreement), and, thus, had a "duty to maintain its secrecy [and] limit its use." *Id.* It is enough that he knew that information and used it. A physical taking or use is unnecessary. *Stampede Tool Warehouse, Inc. v. May*, 272 Ill.App.3d 580, 590, 651 N.E.2d 209, 217 (1995), *as modified* (June 14, 1995) ("Using memorization to rebuild a trade secret does not transform that trade secret from confidential information into non-confidential information.").

Finally, it is inevitable that Andersson would use Seed's confidential information as part of his proposed new business. When considering whether someone will inevitably use trade secret information, courts consider "1) the level of competition between the former employer and the new employer; 2) whether the employee's position with the new employer is comparable to the position he held with the former employer; and 3) the actions the new employer has taken to prevent the

former employee from using or disclosing trade secrets of the former employer." *RKI, Inc.*, 177 F. Supp. 2d at 876.

Andersson did not have any experience with digital assets like Bitcoin prior to working at Seed. Woodford Decl. ¶ 15. Any knowledge that he has gained about how to overcome the challenges of implementing a digital-asset exchange came from his work with Seed. Woodford Decl. ¶ 25-27. Now, without any other experience in developing a digital-asset exchange, he wants to build his own. That exchange will trade in the same types of assets and in the same way as Seed's current exchange and its planned offerings. Woodford Decl. ¶ 19, 23-27. It is inevitable that he will use the trade-secret information that he learned from Seed when implementing his own digital-asset exchange.

### D. Andersson violated DTSA by misappropriating Seed's trade secrets in support of his own new business venture

The Defend Trade Secrets Act (DTSA) gives a federal private cause of action to an "owner of a trade secret that is misappropriated . . . if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836 (b)(1). "The definitions of 'trade secret,' 'misappropriation,' and 'improper means' are substantially similar under the Illinois Trade Secrets Act (ITSA)." *Signal Fin. Holdings, LLC v. Looking Glass Fin. LLC*, Case No. 17 C 8816, 2018 WL 636769, at *3 (N.D. Ill. Jan. 31, 2018). The DTSA defines a trade secret as:

> all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—
>
> (A) the owner thereof has taken reasonable measures to keep such information secret; and
>
> (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily

22

> ascertainable through proper means by, another person who can
> obtain economic value from the disclosure or use of the
> information[.]

18 U.S.C. § 1839 (3). And "misappropriation" is defined as:

> (A) acquisition of a trade secret of another by a person who knows or
> has reason to know that the trade secret was acquired by improper
> means; or
>
> (B) disclosure or use of a trade secret of another without express or
> implied consent by a person who—
>
> (i) used improper means to acquire knowledge of the trade secret;
>
> (ii) at the time of disclosure or use, knew or had reason to know that
> the knowledge of the trade secret was—
>
> (I) derived from or through a person who had used improper means
> to acquire the trade secret;
>
> (II) acquired under circumstances giving rise to a duty to maintain the
> secrecy of the trade secret or limit the use of the trade secret; or

*Id.* § 1839 (5). "Improper means" includes "a breach of a duty to maintain secrecy. . . ." 18 U.S.C. §

1839(6)(A).

For the same reasons that Andersson violated the ITSA, he also violated the DTSA. The

information described above are trade secrets under the DTSA, at least as "financial, business, . . .

technical, [and] economic . . . information." 18 U.S.C. § 1839(3); *Mission Measurement Corp. v.

Blackbaud, Inc.*, 216 F. Supp. 3d 915, 921 (N.D. Ill. 2016). Andersson acquired Seed's trade secrets

through an "improper means" when he downloaded confidential information from Seed for use in

his own business venture. 18 U.S.C. § 1839 (5-6). He also misappropriated Seed's trade secrets when

he used them as part of a presentation touting his own business.  Such a use breached both the

parties' relevant agreements as well as Andersson's duty to maintain the secrecy of that information.

*Id.*; *Molon Motor & Coil Corp. v. Nidec Motor Corp.*, No. 16 C 03545, 2017 WL 1954531, at *5 (N.D. Ill.

May 11, 2017) ("breach of his duty to maintain secrecy readily meets the definition of acquiring trade

secrets through 'improper means'"). Finally, it is inevitable that Andersson will use these trade secrets in his own business given his lack of experience in the industry and his statements to Seed's investor that he had the "secret sauce" necessary to run an exchange. *See Molon Motor & Coil*, 2017 WL 1954531, at *7 (applying "inevitable disclosure doctrine" to DTSA claim).

## II.     Seed will be irreparably harmed absent a TRO, and there is no adequate remedy at law that will compensate it for Andersson's actions

The other two threshold elements that Plaintiff must prove to support the issuance of a TRO or a preliminary injunction are that it (1) has no adequate remedy at law, and (2) will suffer irreparable harm if the relief is not issued. These two requirements—irreparable harm and no adequate remedy at law—tend to merge. *See Roland Machinery Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 387 (7th Cir. 1984). "The question is then whether the plaintiff will be made whole if he prevails on the merits and is awarded damages." *Id.* at 386. An injury is "irreparable" when it is of such a nature that the injured party cannot be adequately compensated in damages or when damages cannot be measured by any pecuniary standard. *Meridian Mut. Ins. Co. v. Meridian Ins. Group, Inc.*, 128 F.3d 1111, 1120 (7th Cir. 1997); *see also Gateway Eastern Ry. Co. v. Terminal R.R. *1043 Ass'n of St. Louis*, 35 F.3d 1134, 1140 (7th Cir. 1994) ("showing injury to goodwill can constitute irreparable harm that is not compensable by an award of money damages"); *Somerset Place, LLC v. Sebelius*, 684 F. Supp. 2d 1037, 1042-43 (N.D. Ill. 2010).

### A.     The parties' agreements contemplate that breaches of the confidentiality provision will result in irreparable harm entitling Seed CX to an injunction

The 2015 and 2018 Agreements had identical provisions regarding the availability of injunctive relief following breaches of the confidentiality provisions:

> EQUITABLE RELIEF
>
> Consultant and the Company agree that it would be impossible or inadequate to measure and calculate the Company's damages from any breach of the covenants set forth in Sections 2 [governing confidentiality]. . . .  Accordingly, Consultant and the Company agree

> that if Consultant breaches Sections 2 . . ., the Company will have
> available, in addition to any other right or remedy available, the right
> to obtain from any court of competent jurisdiction an injunction
> restraining such breach or threatened breach and specific
> performance of any such provision.  Consultant and the Company
> further agree that no bond or other security shall be required in
> obtaining such equitable relief and Consultant and the Company,
> hereby consent to the issuances of such injunction and to the
> ordering of such specific performance.

2018 Agreement at 4. Under Delaware law, courts credit the existence of such an agreement as

nearly conclusive on the appropriateness of injunctive relief.  *See Vitalink Pharmacy Servs., Inc. v.*

*Grancare, Inc.*, No. 15744, 1997 WL 458494, at *9 & n. 46 (Del. Ch. Aug. 7, 1997) ("That element of

the injunction standard is established by GranCare's own contractual stipulation in the Non–

Competition Agreement, that '. . . Vitalink will suffer substantial and irreparable harm in the event

. . . New GranCare should engage in the [IP] Business in competition with Vitalink.'"); *Optionmonster*

*Holdings, Inc. v. Tavant Techs., Inc.*, No. 10 C 2792, 2010 WL 2639809, at *9 (N.D. Ill. June 29, 2010)

(noting presence of such an agreement in support of granting injunctive relief). Giving effect to such

a provision makes sense given the kind of injury that occurs from the misuse of confidential

information, as discussed in the next section.

### B. Damages from the breach of the confidentiality provision, the non-competition provision, or the misappropriation of Seed's trade secrets will not adequately compensate Seed

The injury that results from breaching a non-compete provision includes the loss of goodwill

with Seed's customers and investors, the potential lost business from the competing business, and

the disadvantage from having to compete against someone who can free-ride on the company's

investment to form his own venture.  *Signal Fin. Holdings*, 2018 WL 636769, at *5 (misappropriation

placed owner of trade secret "at risk of losing potential investors as well as its competitive

advantage, both irreparable injuries."). These injuries are irreparable and justify injunctive relief.  *See*

*also Hough Assocs.*, 2007 WL 148751, at *18, judgment entered, (Del. Ch. 2007) (court describing its

"use [of] injunctive relief as the principal tool of enforcing covenants not to compete"). Andersson's solicitation of Seed's flagship investor and customer damaged and could further damage the goodwill the company has generated, and his business venture would stand on the shoulders of Seed's three years of investment.

Apart from the non-compete provision, Seed will suffer irreparable harm from the breach of the confidentiality provisions. "[A]n employer has a recognized business interest in protecting trade secrets disclosed in confidence to the employee during the course of his employment . . . even where . . . there is no enforceable restrictive covenant between the parties." *Hexacomb Corp. v. GTW Enters., Inc.*, 875 F. Supp. 457, 464 (N.D. Ill. 1993) (internal citation omitted). Once someone misappropriates and uses confidential information, it begins to lose its value, which damages will not compensate. *See also Agilent Techs.*, 2010 WL 610725, at *32 (granting injunction "preventing the defendants from any further misuse of Agilent's confidential information or further breach of contract").

Likewise, the ITSA and DTSA provide for injunctive relief. 18 U.S.C. § 1836 (b)(3)(A); 765 ILCS 1065/3. Under Illinois law, "there is a rebuttable presumption of irreparable harm in cases involving misappropriation of trade secrets." *Optionmonster Holdings*, 2010 WL 2639809, at *9. This is because "trade secret misappropriation results in the intangible loss of competitive advantage, customers, and goodwill." *Id.* (granting injunction under ITSA and DTSA). These types of injuries are presumed to be irreparable because "it is virtually impossible to ascertain the precise economic consequences of intangible harms, such as damage to reputation and loss of goodwill, caused by such violations." *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 902 (7th Cir. 2001). In addition, the proposed injunction under DTSA is based on the current available evidence of Andersson's threatened misappropriation. 18 U.S.C.A. § 1836(b)(3).

### III. Remaining factors favor injunctive relief

The remaining equitable factors favor injunctive relief. The high probability of Seed's success at trial means that "any harm suffered by the defendant[] as a result of an injunction carries considerably less weight." *Signal Fin. Holdings*, 2018 WL 636769, at *5. Regardless, such harm would be minimal because Andersson's business is in its nascent stages. To Seed's knowledge, Andersson has not invested substantially in the business yet. And, regardless, he has not expended anything near the amount that Seed has in developing its trade secrets as part of its business over the last three years. *See Optionmonster Holdings*, 2010 WL 2639809, at *10 (equities favored the trade-secret owner because it had "spent significant money and time in conceptualizing, designing, launching, and supporting the System.").

Finally, there is a public interest in issuing an injunction here. "[T]he public interest is well-served by enforcing valid contracts and protecting trade secrets." *Id.* Seed has expended considerable resources in developing its exchange for a novel type of asset. The public has an interest in promoting such innovation. But that innovation is only possible if companies can protect the fruits of their work – whether by securing the confidentiality of their trade secrets or ensuring others do not free-ride on their labors and establish a competing business.

### IV. Relief

Accordingly, Seed asks the Court to enjoin Andersson's use of Seed's trade secrets and confidential information, enjoin Andersson's solicitation of Seed's customers until August 2019, and enjoin Andersson's competing against Seed until April 2019. Seed CX also asks the Court to order Andersson to destroy any Seed CX confidential information that he has in his possession

Dated:  September 4, 2018                Respectfully Submitted,

                                         By:  /s/ *Katharine A. Roin*

                                              Matthew R. Ford (ARDC# 6292833)
                                              matthew.ford@bartlit-beck.com
                                              Katharine A. Roin (ARDC# 6302872)
                                              kate.roin@bartlit-beck.com
                                              Bartlit Beck Herman Palenchar & Scott LLP
                                              54 West Hubbard Street, Suite 300
                                              Chicago, IL 60654
                                              Phone: (312) 494-4400
                                              Facsimile: (312) 494-4440

                                              *Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I, Katharine A. Roin, hereby certify that on September 4, 2018, I filed a true and correct copy of the foregoing document using the Court's CM/ECF system, which will cause a Notice of Electronic Filing to be sent to all counsel of record.

By: _/s/ Katharine A. Roin_

Katharine A. Roin (ARDC# 6302872)
kate.roin@bartlit-beck.com
Bartlit Beck Herman Palenchar & Scott LLP
54 West Hubbard Street, Suite 300
Chicago, IL 60654
Phone: (312) 494-4400

_Attorney for Plaintiff_