# THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| SEED CX LTD., <br><br> Plaintiff, <br><br> v. <br><br> RUSSELL ANDERSSON and HEALTH CARE ANALYTICS, LLC, <br><br> Defendants. | Case No. 18-cv-6022 <br><br> The Hon. Edmond E. Chang |

## DECLARATION OF EDWARD WOODFORD

1.  My name is Edward Woodford. I am the CEO of Plaintiff Seed CX Ltd. I graduated with First Class Honors from the University of Warwick in the United Kingdom, and I completed my Master of Finance at Massachusetts Institute of Technology in 2015. A fellow MIT student and I founded Seed CX, Ltd. in 2015, where I currently serve as the CEO. Seed CX is a holding company for various subsidiaries focused on the exchange and settlement of digital assets (collectively, "Seed").[1] Amongst other registrations, Seed is approved by the Commodity Futures Trading Commission ("CFTC") as a Swap Execution Facility and FINCEN as a Money Service Business.

2.  I have personal knowledge of the allegations made against Russell Andersson and Health Care Analytics, LLC., which I discuss more fully below.

---

[1] Seed CX Ltd. is a Delaware C-Corp that wholly owns Delaware LLCs Seed Futures, Seed SEF, Seed Digital Securities Market, Seed Digital Commodities Market, Zero Hash & Seed Digital Assets Broker.

## Seed

3.     Seed is a start-up company based in Chicago, IL. We are building a trading platform on which institutional traders can trade and exchange digital assets, such as Bitcoin or other crypto-based assets. Digital assets are an emerging technology, and people are finding new uses and applications every day. As a result, the technology and the tradable assets themselves have drawn increasing interest from investors, traders, banks, and startup companies.

4.     Seed has developed the regulatory infrastructure, systems and technology that allows for the exchange and settlement of digital assets.  Generally, an exchange matches buyers and sellers and then settles the trade.  "Settling" a trade occurs after the trade of a particular digital asset and Seed manages the payments and movements of that asset. For example, a seller may be offering a single Bitcoin for $5,000, and a buyer wants to buy the Bitcoin at that price. Seed offers a number of ways in which this buyer and seller could be matched, and, once they are matched, Seed would facilitate the transfer of $5,000 to the seller and the single Bitcoin to the buyer. In addition, Seed will allow buyers to purchase digital assets on margin. If a seller is offering one Bitcoin for $5,000, a buyer can enter an order and execute a trade to purchase that Bitcoin with less than the full $5,000 in their account (e.g., if $2,500 is in the buyer's account, this would represent a 50% margin trade), although the buyer would still need to deliver the full $5,000 to complete the settlement of the transaction. Seed will also allow collateral to be posted not only in dollars but in digital assets.

5.     Establishing these exchanges involves merging traditional markets and regulations with an entirely new kind of asset that poses unique regulatory and technological challenges.

6.     Getting a trading platform for digital assets to work has required us to solve several business and technological problems, some of which are discussed in greater depth below. Among these problems are finding ways to manage the unique risks associated with digital asset trading (including parties who default on their commitments or the use of digital assets as collateral), storing

2

and accounting for digital assets, and obtaining funding and investors willing to take a risk on an unproven company in a new market.

7. Seed is different because it is providing an exchange for institutional investors. In simple terms, an exchange's primary customers are either retail or institutional. A retail exchange focuses on individual or smaller investors. Institutional exchanges involve larger investors, who typically own a much higher amount of a given asset. In addition, institutional investors make larger, more complex transactions, such as buying on margin or trading derivatives. This in turn places a greater strain on the company to figure out how to make these transactions possible in the first place while ensuring the integrity of the process and Seed's own profitability. Finally, our system must work with the other computer systems that institutional investors use.

8. These transactions are made more complicated by the unique features of digital assets. One of the features of a digital asset is the existence and use of a unique "private key" associated with each asset, which is used to secure said asset. These private keys are used to verify transactions and to enable secure movements between buyers and sellers. A digital exchange typically has to "hold" digital assets for customers in order to allow efficient trading and settlement of such digital assets. Another feature of digital assets is the publicly available ledger that maintains all movements. Every transaction that results in a ledger update is mathematically verified. Building systems and working with vendors to store digital assets, interacting with the blockchain, and updating that ledger are unique technical challenges that Seed has had to overcome.

9. Because it is a financial exchange, Seed is heavily regulated. It is essential to our business that we satisfy federal and state regulations governing exchanges. Part of the challenge in setting up the business has been finding a way to fit a twenty-first century asset into established regulations. Navigating federal and state regulatory requirements has been essential to our success and to differentiate the company from others. Seed has a Swap Execution Facility that is regulated

by the Commodity Futures Trading Commission (CFTC) and European regulators also recognize the registration status. We are in final stages of preparing a registration with FINRA as a broker-dealer. Because we settle fiat and crypto, we are a regulated Money Service Business with the U.S. Treasury Department's Financial Crimes Enforcement Network (FinCEN) and are approved as a Money Transmitter in over a dozen states. Seed also has a licensed Introducing Broker with the National Futures Association and the CFTC. In order to obtain these registrations or approvals, Seed has invested substantial time and money in both understanding the requirements for registration and structuring our business to ensure ongoing compliance, which is viewed as one of our key competitive edges in the sector. The company's investment has been high because of the unique challenges posed by digital or crypto assets. Seed competes in the United States and European markets for digital asset exchanges, although our customer base is worldwide.

      10.     Seed is exposed to many of the challenges that face any new technology company. Seed has successfully closed several rounds of funding with venture-capital firms. We are in the process of closing another. We are discrete with the identity of our funders until the round is closed and their participation is publicly announced. Venture capital firms invest money with the anticipation of a certain life expectancy of the company given the funds and known expenses, after which they reevaluate the company and the market to decide whether to invest more. If an investor decides not to continue with its investment, that decision can be hard for a startup like Seed to overcome. Not only would there be the loss of new funds and technical contributions from investors, and the potential growth that would come along with said investment, but an investor not re-investing is often seen as a negative signal to other would-be investors. First off, the company loses money to grow or fund operations. In turn, that can affect the willingness of current customers to remain with the company or can prevent the company from attracting enough customers to get off the ground. The decision to withdraw can also send a negative signal to other

4

actual or potential funders. In effect, when a company that had once funded a startup decides to stop doing so, in my experience other investors will stay away. Furthermore, we rely on our funders to allocate their limited time to help us succeed. Their goodwill is crucial to our future.

11. My experience has been that raising money as a startup is difficult. It took me and my co-founder years to develop the relationships with individual venture capital firms needed to fund the company. Most if not all of our investors are future customers. Because Seed is an institutional platform, the same companies that are investing in Seed's development will one day use the platform for their own institutional trading. As a result, the goodwill that we have developed with these funders is essential to Seed's ongoing and future operations because, without it, we are alienating our future customer base.

12. Finally, institutional investors require that an exchange provide a way to convert a digital asset (like Bitcoin) into a "fiat" asset (such as the U.S. dollar). That requires Seed to develop strong relationships with banks, which can hold the fiat assets. Whether a specific bank is involved with crypto assets or crypto companies is not generally known because banks do not disclose their customer base and typically do not release their position on businesses involved in digital assets. Seed only established these relationships through extensive networking and through the founders' connections. The relationships that Seed has developed with these banks are in turn essential to Seed providing the services its investors and customers require.

## **Relationship with Russell Andersson**

13. Seed is a startup and a small company, and we rely on consultants to develop our business. Hiring a consultant is usually cheaper than hiring a full-time employee and provides greater flexibility to the company. Consultants normally have industry experience that is relevant to problems the startup is facing. It is a balancing act having a consultant. We want to provide full access to the company so that the consultant can provide the best advice possible. We also do not

5

want to be teaching the consultant how to be a future competitor. Because we are new and small, our biggest asset as a company is the work we have been doing, and we take pains to protect that work.

14. We take the protection of our confidential information seriously. To protect our confidential and proprietary information, including trade secrets, we require strong passwords be used and be changed periodically; enforce two factor authentication as a pre-requisite to access its data and programs; use Google Vault to keep an immutable record of all communications made by employees and consultants; maintain logs and audits to track every view of every document; run periodic and independent cyber tests; restrict our trade operations to non-employees, which Seed implemented for CFTC compliance; require all employees and consultants to sign an NDA; require investors to sign NDAs to get access to confidential data about the company; and maintain an internal and external legal team to review contracts for confidentiality clauses.

15. Seed hired Russell Andersson in 2015 to be a consultant. He has worked with the company on various matters, including, assistance of operational gaps analysis; assistance in closing the launch gaps and assisting in defining a viable launch plan; assistance in defining the 2018 strategic plan; helping with recruiting engineering team; assistance with CFO transition; and other assistance that may be requested by the founders. Ex. 2 (2018 Agreement, at Ex A); Ex. 1 (2015 Agreement, at Ex. A); Ex. 3, Mutual Non-Disclosure Agreement. We retained Mr. Andersson because of his background with exchanges generally, but to my knowledge he did not have a background in digital assets. Although the 2015 Agreement said it was only for two months, the parties applied the terms of the agreement until Mr. Andersson terminated the agreement in April 2018.

16. As part of that relationship, Mr. Andersson had access to Seed's confidential technical, financial, and strategic information. For example, he was granted one of the widest

6

accesses of all employees and consultants on our data storage systems Google Drive and Confluence. He had administrative rights to our customer relationship management database, which included information on all our customers and contact details.

## Mr. Andersson's New Business

17. On Friday, August 24, 2018, one of Seed's board members received an email from another investor and potential future customer of Seed. The investor stated that he had received an email from Mr. Andersson regarding a new business venture that was very similar to Seed. The board member subsequently sent print screens of the email to me via text, which is attached as Ex. 4 to this declaration.

18. As discussed above, we are discreet as to the identities of our funders and they are not widely known until announced. We compete with other startups for the limited amount of capital that exists to invest in startups generally and crypto companies in particular. Mr. Andersson learned the identity of our funders and their interest in the digital asset space as part of his consulting relationship with Seed. As a result, Mr. Andersson developed relationships with Seed's contacts. He personally met the individual from the investment group who he contacted via email on August 24 just a few weeks earlier, on August 6, at our offices in Chicago, IL. He also had administrative rights to our customer relationship management database, which provides the identities of all customers. And he had access to Seed's Google Drive, which included the pipeline of investors, and was often asked to assist in diligence requests from potential investors and as such knew the identities of funders and customers.

19. Mr. Andersson's proposed business is very similar to Seed's. In his Sunday, August 26 presentation to my co-founder and me, the title of Andersson's presentation was Chicago Digital Asset Exchange, attached as Ex. 5 at 1. To be clear, Seed is a digital asset exchange based in

7

Chicago. Andersson has no known current connection with Chicago other than his relationship with Seed.

20. I believe Mr. Andersson also registered the domain name for ChicagoDigitalAssetExchange.com for his company on August 11, 2018. Ex. 6.

21. Although he had been working with us for almost three years, he stated "[w]hile there is a lot of noise / activity in the space, nobody seems to be making any meaningful regulatory progress and many of these competitive teams are facing fundamental blockers around clearing [transactions] mainly." Ex. 4 at 2-4. He stated that he had "solutions to the clearing issue, the shorting issue, the margin issue, and other challenges and have developed a vastly superior exchange / clearing model. It's quick, inexpensive to build, fast to regulate, easy to access, compresses liquidity, etc. and provides numerous other customer benefits that I will profile for you. Its vastly superior to anything that I have seen announced or unannounced . . . this model could own the crypto derivatives space, and has unicorn potential." He said that the investor would "learn a lot about exchanges that may help you in evaluating other parts of your portfolio and overseeing Seed [CX]."

22. I approached Mr. Andersson about this email the on same evening, Friday, August 24. On Sunday, August 26, my co-founder and I arranged to see the presentation that Mr. Andersson intended to present to our investor and future customer the next day. Mr. Andersson did not send us the presentation but instead showed us the presentation via an online screenshare. Because I did not have a copy of the presentation, my co-founder and I took screenshots of the slides as they were presented. I have included those screenshots as Ex. 5 to this declaration.

23. Based on what Andersson showed us, his business plan is to build an exchange and settlement platform for digital assets. He intends to focus on institutional clients and sees obtaining regulatory licenses as a key to the success of the business. [Ex. 5 at 3, "Future of Crypto:

8

institutional, derivative, regulated, global"] This is directly competitive to Seed's own business plan. And while Andersson plans to obtain different licenses to those that Seed currently has, Andersson acknowledges that all of these trading licenses and constructs are comparable and competitive, including those that Seed owns and operates. [Ex. 5 at 7, "Scorecard: No clear winners"]

24. That presentation indicated to me that Mr. Andersson intended to present a business plan to our investor and future customer that directly competed with Seed's current and planned offerings. This is based on several aspects of the presentation that reflect programs that Seed had in place or in development.

25. There are several slides in which Mr. Andersson describes his proposed business model that track areas in which Seed currently operates or plans to operate, and relationships that Seed has developed that Mr. Andersson only obtained through his relationship with Seed. In his presentation to Seed's investor and prospective customer, Mr. Andersson described his business model as the "ultimate long term solution." His business plan is almost entirely based and informed on Seed's work and development in this area, including but not limited to the following areas:

    a) "Direct Access to the widest customer base (Min Deposit $250k)" (Ex. 5 at 15): Mr. Andersson's proposed business would compete directly with Seed to obtain institutional investors, which are the types of customers that would maintain at least this minimum deposit of $250,000. Andersson's claimed focus is also reflected in his August 24, 2018 email with our institutional investor and a future customer. As discussed above, Seed has invested significant time and effort to determine how to scale a digital asset exchange to accommodate institutional investors, and Mr. Andersson had access to and knowledge of our business model, core customers, and related features. Seed has also invested time and energy to develop the goodwill that exists with its current investors and future customers. Mr. Andersson directly

9

targeted the investor and customer that we consider our 'flagship' customer and supporter. Having a current consultant who we introduced to the investor turn around and approach the investor with a competitive business damaged our goodwill with our flagship investor. We rely on our investors to make introductions to other investors and potential customers, as well as potential employees. Mr. Andersson's actions diminished our flagship investor's confidence in Seed. Moreover, Mr. Andersson seems to suggest that his pre-Seed experience is transferrable to securing institutional investors, but his focus at Nadex (where he worked earlier in his career and references multiple times in his presentation) was on retail investors. These customer bases are different.

b) Competitive Landscape and Sales and Strategy Data: Mr. Andersson solicited an employee at Seed through the communication program Slack for a competitive landscape writeup, on August 24, three hours after he contacted our investor to discuss his new company. Ex. 8. Specifically, he asked the junior Seed employee for a "comscape" or a landscape of our competitors. He asked whether the junior Seed employee knew if any other Seed employees could pull the information together for him. He also asked for the "high points" of the weekly sales and strategy update. Mr. Andersson used his seniority at Seed to request this information from the most junior person on the strategy side of the business.

c) Mr. Andersson also had access to Seed's business strategy and budgeting information. Because Seed is regulated, we have needed to figure out how to staff the company to comply with the relevant regulations and ultimately execute in the most efficient way possible. In Mr. Andersson's presentation he used projected numbers that are nearly identical to Seed's.

10

26. In his presentation, Mr. Andersson also identifies several areas as "secret sauce" to any successful digital asset exchange. Ex. 5 at 13. These areas are directly related to Seed's work in this space and are knowledge and information Mr. Andersson gained while working with Seed:

> a) New Risk Management Approaches (*Id.*): Our margining system and our process is not generally known and is a central limitation on the ability of the margining of digital assets. To develop and verify these models, we have had to buy, structure, and aggregate large amounts of data. We then have to back-test our work to verify the assumptions that allow us to match buyers and sellers, including models that allow us to assess the relative credit worthiness of market participants. At one point in the presentation, Mr. Andersson touts the need for new "margin models." A margin model is the way in which exchanges like Seed evaluate how much money or digital assets a person on the exchange must have on hand for the exchange to allow that person to trade on margin. Mr. Andersson states that one type of model (a VAR) is "outdated" and that it is necessary to use a different kind (Monte Carlo). In a general sense, a Monte Carlo-based model or analysis is not specific to Seed or crypto. A Monte Carlo method is a type of algorithm for modeling market behavior. However, a Monte Carlo method is just an algorithm and does not do much without underlying data that reflects market or exchange behavior. In order to create our model, Seed aggregated and analyzed data from a variety of different markets and exchanges to create our model that we use in our current and future offerings. To do so, Seed hired a quantitative analyst ("quant") to conduct the analysis including the Monte Carlo modelling. We purchased data and spent time coding for the model to function. We have also developed a system by which we can assess the risk of an

individual in the market based on crypto holdings and other metrics, which reflects our specific grading of clients and the idiosyncratic risks around crypto holdings.

b) I believe that Mr. Andersson tried to obtain our model for use in his new venture. On Friday, August 24, 2018, Mr. Andersson communicated privately using the communication program Slack with a colleague of mine at Seed that developed our Monte Carlo model. My colleague had given a presentation describing our model. Mr. Andersson asked my colleague several questions about how we developed aspects of our Monte Carlo model, asked for the modeling information from the presentation in a spreadsheet format (which makes it more usable), and inquired into the tool and date that we used to arrive at our model. Ex. 9. Moreover, on August 16, 2018, he downloaded a set of Seed's historical data and related modeling. Prior to this, to my knowledge, Mr. Andersson had no involvement in our modeling. Notably, this communication with my colleague occurred an hour and half after Mr. Andersson had emailed our investor / customer to tell him about his new business. In his presentation, he identified Smart Clearing and Margin, the subjects of our Monte Carlo analysis, as a large part of the value of his company. He referred to this as "Lots more secret sauce!," (Ex. 5 at 15), which I understand to mean that the secrecy of the information regarding smart clearing and margin provide a competitive advantage because they are kept secret.

    i) Mr. Andersson knew the economic value and confidential nature of this data, processes and model; he had personally engaged counsel and threatened in writing to sue a former partner who he believed was about to misappropriate the same confidential and proprietary information.

12

c) "Smart Ledgering": Seed has spent a great deal of time and money to develop its ability to optimize the ledgering of digital assets for institutional clients. Mr. Andersson refers to Smart Ledgering as "More secret sauce." Ex. 5 at 15. Indeed, we have kept our process and technology regarding how we ledger transactions confidential and proprietary and it is essential to our competitive position in the market to continue to do so. Mr. Andersson had no experience with crypto assets, let alone digital and smart ledgering, before joining Seed.

d) Default Management and Default Derivatives for Guarantee Fund (Ex. 5 at 13): Seed has been working on a default solution. On July 5, 2018, I forwarded to Mr. Andersson via email, a detailed spec, tilted "Basic Start to Default Fund Solution," that Seed employees created explaining our idea and its implementation. Mr. Andersson replied that he would be "happy to review and add inputs." Mr. Andersson complimented us that we had identified and potentially solved a "huge issue that prevents institutional adoption." Ex. 10. Even at this date he is unclear how this concept will fit into the existing regulatory construct, yet Mr. Andersson claims in his presentation that he now has the "secret sauce" and claims it is patentable. Ex. 5 at 13. The only way he could have learned this is from his time at Seed.

e) "Expansive Fiat Based Omnibus Relationships ('bankchaining')" (*Id.* at 15): As discussed above, a digital asset exchange for institutional clients requires relationships with banks in order to exchange a digital asset (like Bitcoin) for a fiat currency (like the U.S. Dollar). Seed has developed relationships with several banks in developing its business. Mr. Andersson knows the identity of these banks based

13

on his work with Seed. The identity of the banks with which we have these relationships is not currently known.

27. There are other types of programs and trades that Seed is developing that Mr. Andersson featured in his pitch deck. Ex. 15 at 9. For example, a repurchase agreement or repo is a transaction where a seller agrees to sell an asset at one date for a certain price and then repurchase that asset at a later date from the buyer for a different price. It is basically a type of loan where (at Seed) a digital asset is a form of collateral for the loan. Seed has spent time, money, and effort to figure out how repo works with digital assets. There are specific issues relating to digital assets that make implementing repos difficult, and Seed has invested heavily in figuring out solutions to these issues. For example, as discussed above, managing private keys poses a technical and business challenge. We invested money to figure out the regulatory issues. We invested money on the implementation to tailor and customize the International Swaps and Derivatives Association (ISDA) agreement for digital assets. Fitting our repo transactions into the terms of the Agreement and operationalizing these trades required Seed to invest considerable resources. Mr. Andersson had no prior experience with this process.

28. At the end of the presentation, we expressed our concern with Andersson's planned company and pitch to our investor and future customer.

29. I certify under penalty of perjury that the foregoing is true and correct.

Executed On: September 3, 2018

_____
Edward Woodford