# Exhibit 2

# AMENDED AND RESTATE CONSULTING AGREEMENT

This Amended and Restated Consulting Agreement ("Agreement") is made and entered into as of the 11th day of June 2018 by and between Seed CX Ltd. (the "Company"), and Russell Anderson as represented by HealthCare Analytics, LLC ("Consultant" or "Special Projects Manager"). The Company desires to continue to retain Consultant as an independent contractor to perform consulting services for the Company and Consultant, on terms set forth more fully below. In consideration of the mutual promises contained herein, the parties agree as follows:

1. RECITALS

    a) Consultant and Company executed dated 1st September 2015. Consultant has been working with company on an ad hoc basis since 1st September 2015. Consultant terminated services on 1 April 2018 for a short period, but was re-engaged.

2. SERVICES AND COMPENSATION

    a) Consultant agrees to perform for the Company the services requested by the Company, including the duties and tasks described in Exhibit A ("Services"). Consultant agrees to devote such time to these duties as the Company and Consultant reasonably agree from time to time.

    b) The Company agrees to pay Consultant the compensation set forth in Exhibit A as sole compensation for the performance of the Services.

3. CONFIDENTIALITY

    a) "Confidential Information" means all information, whether or not in writing, concerning the Company's business, technology, business relationships or financial affairs which the Company has not released to the general public. By way of illustration, Confidential Information may include information or material which has not been made generally available to the public, such as: (a) *corporate information*, including plans, strategies, methods, policies, resolutions, negotiations or litigation; (b) *marketing information*, including strategies, methods, customer identities or other information about customers, prospect identities or other information about prospects, or market analyses or projections; (c) *financial information*, including cost and performance data, debt arrangements, equity structure, investors and holdings, purchasing and sales data and price lists; and (d) *operational and technological information*, including plans, specifications, manuals, forms, templates, software, designs, methods, procedures, formulas, discoveries, inventions, improvements, concepts and ideas; and (e) *personnel information*, including personnel lists, reporting or organizational structure, resumes, personnel data, compensation structure, performance evaluations and termination arrangements or documents. Confidential Information also includes information received in confidence by the Company from its customers or suppliers or other third parties.

    b) Consultant will not, at any time, without the Company's prior written permission, either during or after the term of this Agreement, disclose any Confidential Information to anyone outside of the Company, or use or permit to be used any Confidential Information for any purpose other than the performance of the Services for or on behalf of the Company. Consultant will cooperate with the Company and use best efforts to prevent the unauthorized disclosure or use of any and all Confidential Information. Consultant will deliver to the Company all copies of Confidential Information in Consultant's possession or control upon the earlier of a request by the Company or termination of this Agreement for any reason. During the term of this Agreement, Consultant will not, without the Company's prior written approval, directly or indirectly disclose to anyone the existence or terms of this Agreement or the fact that Consultant has this arrangement with the Company.

c)  Consultant understands that the Company is now and may hereafter be subject to non-disclosure or confidentiality agreements with third persons which require the Company to protect or refrain from use of Confidential Information. Consultant agrees to be bound by the terms of such agreements in the event Consultant have access to such Confidential Information.

d)  Consultant agrees that Consultant will not, during the term of this Agreement, improperly use or disclose any proprietary information or trade secrets of any former or current employer or other person or entity with which Consultant has an agreement or duty to keep in confidence information acquired by Consultant, if any, and that Consultant will not bring onto the premises of the Company any unpublished document or proprietary information belonging to such employer, person or entity unless consented to in writing by such employer, person on entity.

4.  OWNERSHIP

a)  Consultant acknowledges that all work performed by Consultant in the direct scope of his duties profiled Exhibit A ("Services") is on a "work for hire" basis, and Consultant hereby assigns and transfers and, to the extent any such assignment cannot be made at present, will assign and transfer, to the Company and its successors and assigns all Consultant's right, title and interest in all inventions, discoveries, designs, developments, methods, modifications, improvements, processes, algorithms, databases, computer programs, formulae, techniques, trade secrets, graphics or images, and audio or visual works and other works of authorship, whether or not patentable or copyrightable, that are created, made, conceived or reduced to practice by Consultant (alone or jointly with others) or under Consultant's direction ("Developments") and that (a) relate to the business of the Company or any customer of the Company or any of the products or services being researched, developed, manufactured or sold by the Company or which may be used with such products or services; or (b) result from tasks assigned to Consultant by the Company; or (c) result from the use of premises or personal property (whether tangible or intangible) owned, leased or contracted for by the Company ("Company-Related Developments"), and all related patents, patent applications, trademarks and trademark applications, copyrights and copyright applications, and other intellectual property rights in all countries and territories worldwide and under any international conventions ("Intellectual Property Rights"). Consultant will make full and prompt disclosure to the Company of all Company-Related Developments.

b)  If Consultant incorporates a Developments that Consultant has, alone or jointly with others, conceived, developed or reduced to practice prior to the date of this Agreement that Consultant considers to be Consultant's property or the property of third parties and that Consultant wishes to have excluded from the scope of this Agreement ("Prior Inventions") into a Company product, process or machine or other work done for the Company, Consultant hereby grant to the Company a nonexclusive, royalty-free, paid-up, irrevocable, worldwide license (with the full right to sublicense) to make, have made, modify, use, sell, offer for sale and import such Prior Invention to the extent it is included into any Company products. Notwithstanding the foregoing, Consultant will not incorporate, or permit to be incorporated, Prior Inventions in any into a Company product, process or machine or other work done for the Company without the Company's prior written consent. Consultant also hereby waives all claims to any moral rights or other special rights which Consultant may have or accrue in any Company-Related Developments. The onus for detailing which Consultant Information is a Prior Invention is solely the responsibility of the Consultant. Consultant will be responsible for notifying the Company prior to disclosing prior inventions to the Company. Consultant is responsible for receiving a written notification from Company that they accept said claim of prior ownership. In the event this does not occur, work product will be assumed to be Company's and will be subject to the terms of Section 4.a.

c)  Consultant will cooperate fully with the Company, both during and after the term of this Agreement, with respect to the procurement, maintenance and enforcement of Intellectual Property Rights in Company-Related Developments. Where applicable, Consultant will sign, both during and after the term of this Agreement, all papers, including without limitation copyright applications, patent applications, declarations, oaths, assignments of priority rights, and powers of attorney, which the Company may deem necessary or desirable in order to protect its rights and interests in any Company-Related Development

2

*R.J.P* (initials)

5. RECORDS; REPORTS

   a) Consultant will keep and maintain adequate and current records of all Confidential Information and Company-Related Developments developed by Consultant during the term of this Agreement, which records will be available to and remain the sole property of the Company at all times.

   b) All files, letters, notes, memoranda, reports, records, data, sketches, drawings, notebooks, layouts, charts, quotations and proposals, specification sheets, or other written, photographic or other tangible material containing Confidential Information, whether created by Consultant or others, which come into Consultant's custody or possession, are the exclusive property of the Company to be used by Consultant only in the performance of the Services. Any property situated on the Company's premises and owned by the Company, including without limitation computers, disks and other storage media, filing cabinets or other work areas, is subject to inspection by the Company at any time with or without notice. In the event of the termination of this Agreement for any reason, Consultant will deliver to the Company all files, letters, notes, memoranda, reports, records, data, sketches, drawings, notebooks, layouts, charts, quotations and proposals, specification sheets, or other written, photographic or other tangible material containing Confidential Information, and other materials of any nature pertaining to the Confidential Information of the Company and to the Service, and will not take or keep in Consultant's possession any of the foregoing or any copies.

   c) Consultant agrees that Consultant will from time to time during the term of this Agreement or any extension thereof keep the Company advised as to Consultant's progress in performing the Services hereunder and that Consultant will, as requested by the Company, prepare written reports with respect thereto. It is understood that the time required in the preparation of such written reports shall be considered time devoted to the performance of Consultant's Services.

6. CONFLICTING OBLIGATIONS; other covenants

   a) Consultant represents and warrants that Consultant has no outstanding agreement or obligation that is in conflict with any of the provisions of this Agreement, or that would preclude Consultant from fully complying with the provisions hereof, and further certifies that Consultant will not enter into such conflicting agreement during the term of this Agreement. Consultant further represents and warrants that it has full power and authority to enter into this Agreement and perform its obligations hereunder.

   b) In order to protect the Company's Confidential Information and good will, during the term of this Agreement and for a period of twelve (12) months thereafter (the "Restricted Period") During the Restricted Period, Consultant will not, directly or indirectly, in any manner, other than for the benefit of the Company, (a) call upon, solicit, divert or take away any of the customers, business or prospective customers of the Company or any of its suppliers, and/or (b) solicit, entice or attempt to persuade any other employee or consultant of the Company to leave the services of the Company for any reason.

   c) Consultant covenants that the services to be provided hereunder shall be in compliance with all applicable laws, rules and regulations.

7. TERM AND TERMINATION

   a) This Agreement will commence on the date first written above, and will continue indefinitely, unless earlier terminated by either party upon such party providing five (5) business days written notice of such termination to the other party.

   b) Notwithstanding the foregoing, the Company may, in addition to any other rights it may have at law or in equity, terminate this Agreement immediately and without prior notice if Consultant refuses to or is unable to perform the Services or is in breach of any material provision of this Agreement. In the event of a dispute over what constitutes a breach hereunder, the parties shall agree to the appointment of an arbitrator to settle such dispute.

N.T.P

  c) Upon such termination all rights and duties of the parties toward each other shall cease <u>except</u>:

    (i) the Company shall be obliged to pay, within thirty (30) days of the effective date of termination, all amounts owing to Consultant for Services actually performed and reimbursable expenses actually incurred prior to termination, if any, in accordance with the provisions of Section 1 (Services and Compensation) hereof; and

    (ii) Sections 2 (Confidentiality), 3 (Ownership), 4(b) (Records; Reports), 5 (Conflicting Obligations; Other Covenants), 8 (Independent Contractors; No Agency), 9 (Equitable Relief), 10 (Severability), 11 (Amendment), 12 (Entire Agreement), 13 (Governing Law), 14 (Notices) and 15 (No Waiver) shall survive termination or expiration of this Agreement.

8. ASSIGNMENT

Neither this Agreement nor any right hereunder or interest herein may be assigned or transferred by Consultant without the express written consent of the Company. For avoidance of doubt, the Company may assign this Agreement to any successor to its business without the consent of Consultant.

9. INDEPENDENT CONTRACTOR; NO AGENCY

Nothing in this Agreement shall in any way be construed to constitute Consultant as an agent, employee or representative of the Company, but Consultant shall perform the Services hereunder as an independent contractor. Consultant acknowledges and agrees that Consultant is obligated to report as income all compensation received by Consultant pursuant to this Agreement, and Consultant agrees to and acknowledges the obligation to pay all self-employment and other taxes thereon and that he will not be eligible for any employee benefits (nor does he desire any them) and expressly waives any entitlement to such benefits. Consultant acknowledges and agrees that he will use his own discretion in performing the tasks assigned, within the scope of work specified by the Company. Consultant further agrees to indemnify the Company and hold it harmless to the extent of any obligation imposed on the Company (i) to pay withholding taxes or similar items or (ii) resulting from Consultant's being determined not to be an independent contractor. Except insofar as it would preclude the Consultant from providing the Services under this Agreement, Consultant is free to perform services for any other person.

10. EQUITABLE RELIEF

Consultant and the Company agree that it would be impossible or inadequate to measure and calculate the Company's damages from any breach of the covenants set forth in Sections 2 or 3 herein. Accordingly, Consultant and the Company agree that if Consultant breaches Sections 2 or 3, the Company will have available, in addition to any other right or remedy available, the right to obtain from any court of competent jurisdiction an injunction restraining such breach or threatened breach and specific performance of any such provision. Consultant and the Company further agree that no bond or other security shall be required in obtaining such equitable relief and Consultant and the Company, hereby consent to the issuances of such injunction and to the ordering of such specific performance.

11. SEVERABILITY

If any provision in this Agreement shall be found or be held to be invalid or unenforceable in any jurisdiction in which this Agreement is being performed, then the meaning of said provision shall be construed, to the extent feasible, so as to render the provision enforceable, and if no feasible interpretation would save such provision, it shall be severed from the remainder of this Agreement which shall remain in full force and effect. In such event, the parties shall negotiate, in good faith, a substitute, valid and enforceable provision which most nearly effects the parties' intent in entering into this Agreement.

12. AMENDMENT

This Agreement may not be amended in any respect other than by written instrument executed by the party against whom enforcement is sought.

R.T.P

13. ENTIRE AGREEMENT

The terms and conditions herein contained constitute the entire agreement between the parties and supersede all previous agreements and understandings, whether oral or written, between the parties hereto with respect to the subject matter hereof, and no agreement or understanding varying or extending the same shall be binding upon either party hereto unless in a written document which expressly refers to this Agreement and which is signed by the party to be bound thereby.

14. GOVERNING LAW

This Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware, without reference to its principles of conflict of laws.

15. NOTICES

   a) Any notice hereby required or permitted to be given shall be sufficiently given if in writing and delivered in person, by facsimile transmission, electronic mail, overnight delivery service or U.S. mail, in which event it may be mailed by first-class, certified or registered, postage prepaid, to either party at the address of such party or such other address as shall have been designated by written notice by such party to the other party.

   b) Any notice or other communication required or permitted to be given under this Agreement will be deemed given (i) on the day when delivered in person, (ii) on the first business day of or after the date of confirmation that the facsimile has been successfully transmitted to the facsimile number for the party notified if sent by facsimile, (iii) on the first business day of or after the date of receipt by the party notified if sent by electronic mail, (iv) on the first business day after deposited with a nationally recognized overnight delivery service, or (v) on the third business day after the day on which such notice was mailed in accordance with this Section.

Any notice or report required or permitted by this Agreement shall be deemed given if delivered personally or if sent by either party to the other by certified or registered first class mail, return receipt requested and postage prepaid, at such other party's principal place of business at the address set forth below or such other address as either party may specify in writing. If by mail, delivery shall be deemed effective three (3) business days after mailing in accordance with the above provisions.

The Company                                     Consultant

_____                            _____

_____                            _____
Telephone:_____                         Telephone: _____

16. NO WAIVER

No waiver of any term or condition of this Agreement shall be valid or binding on either party unless the same shall be been mutually assented to in writing by both parties. The failure of either party to enforce at any time any of the provisions of this Agreement, or the failure to require at any time performance by the other party of any of the provisions of this Agreement, shall in no way be construed to be a present or future waiver of such provisions, nor in any way affect the right of either party to enforce each and every such provision thereafter. The express waiver by either party of any provision, condition or requirement of this Agreement shall not constitute a waiver of any future obligation to comply with such provision, condition or requirement.

17. COUNTERPARTS

This agreement may be signed in one or more counterparts.

R.T.P

IN WITNESS WHEREOF, the parties hereto have caused to be executed or executed this Consulting Agreement as of the day and year first above written.

| CONSULTANT | SEED CX LTD. |
|---|---|
| *[signature]* | By: *[signature]* |
| Name: HealthCare Analytics, LLC | Name: Edward Woodford |
| S.S.N. ███████ | Title: CEO |

19 - June - 2018

6

R.7.p

# EXHIBIT A

## SERVICES AND COMPENSATION

(1) <u>Services</u>

Responsibilities include:

1. Assistance of operational gaps analysis
2. Assist in closing the launch gaps and assisting in defining a viable launch plan.
3. Assistance in defining the 2018 strategic plan.
4. Help with recruiting engineering team.
5. Assistance with CFO transition.
6. Customer acquisition on the West Coast.
7. Executive coaching for founders.
8. Other assistance that may be requested by the founders from time to time.

In terms of time commitment:

June: approximately 14 hours a week
July: 25 hours a week, with a minimum of three (3) days in Chicago
August: 25 hours a week, with a minimum of three (3) days in Chicago
September onwards: ad hoc as needed

(2) Cash Compensation.

    (a)    The Company shall pay Consultant as billed at a rate of $125 per hour for June not to exceed $9k without prior communication with Company. (For budgeting purposes Company, and while making no a legal commitment, should be aware that September is expected to be in the $7,5K range, October in the $5k range, and November in the $2k range with the scope of services expecting to be complete on or before 15 November 2018).

    (b)    The Company shall pay Consultant 12,500 for July and August.

    (c)    The Company shall pay Consultant $125 per hour for September onwards.

All payments are made in arrears.

The Company shall reimburse Consultant for all reasonable travel and out-of-pocket expenses incurred by Consultant in performing Services pursuant to this Agreement, provided Consultant receives prior written consent from an authorized agent of the Company prior to incurring such expenses.

Consultant shall submit all statements for expenses in a form prescribed by the Company and such statements shall be approved by the contact person listed above.

For each Referred Participant introduced by Consultant, Seed agrees to pay Referrer a commission (the "Referral Commission") equal to:

    a. 10 per cent of all Commissionable Receipts paid by each Referred Participant during the first year after executing a Participant Agreement; and
    b. 5 per cent of all Commissionable Receipts paid by each Referred Participant during the second year after executing a Participant Agreement.

**3). Equity Compensation:**

Company will issue consultant 5,621 shares, issued at the now current fair value market price, to vest monthly over

*R.J.P*

the next 12 months such that full vesting of equity will occur on 1 July 2019.

## Prior Inventions:

A methodology for holding auctions for the sale or auctioning of financial derivatives or physical assets.
A methodology and design of credit default futures.

n.7.p

9